1  Brian T. Peterson, WSBA #42088
   Ruby A. Nagamine, WSBA #55620
2  K&L GATES LLP
   925 Fourth Avenue, Suite 2900
3  Seattle, WA 98104-1158
   (206) 623-7580

Honorable Marc L. Barreca
Chapter 11
Hearing Location: Courtroom 7106
Hearing Date: February 22, 2024
Hearing Time: 9:30 a.m.
Response Date: February 15, 2024

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

In re:

HWC BURBS BURGERS LLC

                          Debtor.

Case No. 23-11919-MLB

**DECLARATION OF JOE POLITO IN SUPPORT OF (I) PIONEER SQUARE DEVELOPMENT LENDER, LLC'S OBJECTION TO DEBTOR'S PROPOSED CHAPTER 11 PLAN; AND (II) JOINDER TO UNITED STATES TRUSTEE'S MOTION TO CONVERT OR DISMISS**

I, Joe Polito, hereby state as follows:

1.     I am the President of Pillar Properties, which is a dba for R.D. Merrill Real Estate Holdings, LLC ("**Merrill Real Estate**"). Merrill Real Estate is a member of Pioneer Square Lender Development, LLC ("**Pioneer Square**"). I am over the age of eighteen and I am competent in all ways to testify. I have knowledge of the facts set forth in this Declaration, and I can and would testify competently to these facts if called to do so. I submit this Declaration in support of (i) *Pioneer Square Lender Development, LLC's Objection to Debtor's Proposed Chapter 11 Plan*; and (ii) *Pioneer Square's Joinder to the United States Trustee's Motion to Convert or Dismiss Chapter 11 Case*.

DECLARATION OF JOE POLITO IN SUPPORT OF (I) OBJECTION TO
DEBTOR'S PROPOSED PLAN; AND (II) UST'S MOTION TO CONVERT
OR DISMISS - 1
507422461.7

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Case 23-11919-MLB    Doc 71    Filed 02/15/24    Ent. 02/15/24 14:23:33    Pg. 1 of 103

2.     Pioneer Square owns the commercial real property with the common address of 201 King Street, Seattle, WA 98104 (the "**Property**"). Pioneer Square leases the Property to the Debtor pursuant to the terms of that certain Lease Agreement with the effective date of March 7, 2014 (the "**Lease Agreement**") between Pioneer Square and Quality Athletics, LLC. The Lease Agreement was assigned from Quality Athletics, LLC, to HWC Burbs Burgers LLC pursuant to that certain Assignment and Assumption of Lease, with an Effective Date of December 16, 2022 (the "**Assignment**"). The Debtor operates a restaurant at the Property under the name of "Burbs Burgers."

3.     As of the Petition Date for this Bankruptcy Case, Pioneer Square's claim against the Debtor for prepetition amounts due and owing under the Lease Agreement was no less than $264,423.06. Pioneer Square filed Proof of Claim No. 8 in this Bankruptcy Case evidencing its claim. A true and correct copy of Pioneer Square's Proof of Claim No. 8, which also includes a copy of the Lease Agreement and Assignment, is attached hereto as Exhibit A.

4.     Pillar Properties is authorized to collect rent from the Debtor on behalf of Pioneer Square, manage the Property, and communicate with the Debtor regarding issues related to the Lease Agreement. The Debtor has failed to timely pay postpetition rent owed to Pioneer Square under the Lease Agreement. Rent under the Lease Agreement, which includes "Base Rent," "Operating Costs," and deferred rent amounts, is due on the first day of each calendar month. *See* Exhibit A, Lease Agreement. In addition, pursuant to the Third Amendment to Lease, the Debtor owes eight percent (8%) of the Debtor's gross sales over and above two-hundred thousand dollars ($200,000.00) each calendar quarter ("**Percentage Rent**"). *See id.*, Third Amendment to Lease. Such Percentage Rent is due on the fifteenth day of the month following the calendar quarter. *Id.*

5.     The Debtor did not timely pay rent owed to Pioneer Square for the month of January 2024, in the amount of $10,100.65. Pillar Properties' ACH pull on January 9, 2024, for such amounts was returned due to insufficient funds in the Debtor's bank account. On January 23, 2024,

DECLARATION OF JOE POLITO IN SUPPORT OF (I) OBJECTION TO
DEBTOR'S PROPOSED PLAN; AND (II) UST'S MOTION TO CONVERT
OR DISMISS - 2
507422461.7

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Case 23-11919-MLB     Doc 71     Filed 02/15/24     Ent. 02/15/24 14:23:33     Pg. 2 of 103

Pillar Properties made a second attempt to collect rent for January 2024. Pillar Properties' second ACH pull was also returned due to insufficient funds. Eventually, the Debtor wired funds for January rent to Pillar Properties on February 5, 2024.

6.　　The Debtor provided Pillar Properties with its sales revenues for the fourth quarter of 2023 in late January. Based on the information provided by the Debtor, the Debtor owes Pioneer Square Percentage Rent in the amount of $18,713.17. Such amounts came due under the Lease Agreement on January 15, 2024. As of the date of this Declaration, the Debtor has failed to pay the Percentage Rent owed to Pioneer Square. In addition, the Debtor has failed to pay the rent for February 2024 under the Lease Agreement, which totals $10,073.15.

7.　　As of February 8, 2024, the total amount the Debtor owes to Pioneer Square under the Lease Agreement is $298,273.16. An itemized statement detailing the amounts the Debtor owes to Pioneer Square under the Lease Agreement is attached hereto as Exhibit B.

8.　　Pioneer Square does not agree to the proposed assumption and assignment of the Lease Agreement under the Debtor's proposed chapter 11 plan. Pioneer Square never agreed to discount the amount of "cure" that would be owed by the Debtor in connection with assumption or assumption and assignment of the Lease Agreement. Nor did Pioneer Square ever agree to continue the Debtor's deadline to assume or reject the Lease Agreement pursuant to the Bankruptcy Code.

I declare under penalty of perjury of the laws of the State of Washington and the United States of America that the foregoing is true and correct to the best of my knowledge.

EXECUTED this 14th day of February 2024, at Seattle, Washington.

Joe Polito

DECLARATION OF JOE POLITO IN SUPPORT OF (I) OBJECTION TO DEBTOR'S PROPOSED PLAN; AND (II) UST'S MOTION TO CONVERT OR DISMISS - 3
507422461.7

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Case 23-11919-MLB　　Doc 71　　Filed 02/15/24　　Ent. 02/15/24 14:23:33　　Pg. 3 of 103

# Exhibit A

**Fill in this information to identify the case:**

Debtor 1     HWC Burbs Burgers LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:   Western District of Washington

Case number   23-11919

## Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

Pioneer Square Development Lender LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

c/o K&L Gates LLP/Attn: Brian Peterson
Name

925 4th Avenue, Suite 2900
Number          Street

Seattle                    WA          98104
City                         State          ZIP Code

Contact phone _____

Contact email  brian.peterson@klgates.com

Where should payments to the creditor be sent? (if different)

Name

Number          Street

City                         State          ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____   Filed on _____
                                                                                                                MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

7. **How much is the claim?**   $_____264,423.06   **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Amounts owed under Lease Agreement

9. **Is all or part of the claim secured?**

☐ No

☑ Yes.   The claim is secured by a lien on property.

**Nature of property:**

☑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:**   Lease Agmt/Security Dep

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**   $_____

**Amount of the claim that is secured:**   $_____9,437.50

**Amount of the claim that is unsecured:**   $_____254,985.56 (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $_____264,423.06

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

10. **Is this claim based on a lease?**

☐ No

☑ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____264,423.06

11. **Is this claim subject to a right of setoff?**

☐ No

☑ Yes. Identify the property: Security Deposit

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date _____
MM / DD / YYYY

### See Attached Signature Page
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | | | |
| Company | | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | | | |
| | Number | Street | |
| | City | State | ZIP Code |
| Contact phone | _____ | Email | _____ |

_Kevin Daniels_
Signature

Executed on date    12/14/2023
                          MM / DD / YYYY

_Joe Polito_
Signature

Executed on date    12/14/2023
                          MM / DD / YYYY

**Print the name of the person who is completing and signing this claim:**

**Stadium Place Investors, LLC, a Washington limited liability company and Manager of Pioneer Square Development Lender LLC**

      **By: North Lot Development, L.L.C., Manager**
        **By: North Lot Investors LLC, Member**
          **By: Daniels Real Estate, LLC, Manager**

By:  Name   _Kevin Daniels_

    _Manager_
Title

_Daniels Real Estate, LLC_
Company
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address   _2401 Utah Ave South, Suite 305_
           Number      Street

 _Seattle_               _WA_             _98134_
City                        State                ZIP Code

Contact phone _____ Email _____

     **By: R.D. Merrill Real Estate Holdings, LLC, Member**

By:  Name   _Joe Polito_

_President_
Title

_Pillar Properties_
Company
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address _1938 Fairview Avenue E, Suite 300_
          Number      Street

 _Seattle_               _WA_             _98102_
City                        State                ZIP Code

Contact phone _____ Email _____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HWC BURBS BURGERS LLC | ) Case No. 23-11919-MLB |
| | ) |
| Debtor. | ) |
| | ) |

## ADDENDUM TO PROOF OF CLAIM OF PIONEER SQUARE DEVELOPMENT LENDER LLC

This Addendum is submitted with and incorporated in the Proof of Claim filed against HWC Burbs Burgers LLC in the above-captioned case (the "**Chapter 11 Case**") by Pioneer Square Development Lender LLC ("**Pioneer Square**"). In support of this Proof of Claim, Pioneer Square states as follows:

1.      Pioneer Square has an office address of 1938 Fairview Avenue East, Suite 300, Seattle, WA 98102. The signatory of this Proof of Claim is Stadium Place Investors, LLC as Manager of Pioneer Square, who is authorized to execute this Proof of Claim on behalf of Pioneer Square.

2.      Pioneer Square owns the commercial real property with the common address of 201 King Street, Seattle, WA 98104 (the "**Property**"). Pioneer Square leases the Property to the Debtor pursuant to the terms of that certain Lease Agreement with the effective date of March 7, 2014 (the "**Lease Agreement**") between Pioneer Square and Quality Athletics, LLC, a copy of which is attached hereto as Exhibit 1. The Lease Agreement was subsequently amended pursuant to multiple amendments, copies of which are attached hereto as Exhibit 2. The Lease Agreement assigned from Quality Athletics, LLC, to HWC Burbs Burgers LLC pursuant to that certain

507286616.4

Assignment and Assumption of Lease, with an Effective Date of December 16, 2022 (the "**Assignment**"). A copy of the Assignment is attached hereto as <u>Exhibit 3</u>.

3.      As of the Petition Date, Pioneer Square's claim against the Debtor for prepetition amounts due and owing under the Lease Agreement was no less than $264,423.06. A detailed ledger of all outstanding amounts owed under the Lease Agreement may be provided upon request.

4.      Pioneer Square asserts that it has a secured claim to the extent of the security deposit that it holds in connection with the Lease Agreement, in the amount of $9,437.50. Pioneer Square reserves the right to assert that any claims the Debtor may assert against Pioneer Square are subject to rights of setoff and/or recoupment.

5.      Pursuant to Section 365(d)(3) of the Bankruptcy Code, Pioneer Square asserts that the Debtor is obligated to pay postpetition rent and other amounts owed under the Lease Agreement. Such amounts are entitled to administrative expense priority pursuant to 11 U.S.C. § 503(b).

6.      Pioneer Square reserves the right to (a) amend and/or supplement this Proof of Claim at any time, including after the applicable bar date, and in any manner; and (b) file additional proofs of claim for any additional claim(s) against the Debtor or any obligor that may be based on the same or additional documents or grounds of liability. This Proof of Claim is not, and shall not be deemed to be, a waiver of any claim by Pioneer Square and all claims are hereby asserted and preserved.

7.      The filing of this Proof of Claim is not and shall not be deemed or construed as (a) a waiver or release by Pioneer Square of any rights against any person, entity, or property; (b) a consent by Pioneer Square to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case otherwise involving Pioneer Square; (c) a waiver or

2

release of Pioneer Square's right, or Pioneer Square's consent, to trial by jury in this Court or any other court in any proceeding, whether or not the same be designated legal or private rights or in any case, controversy or proceeding related thereto, notwithstanding the designation or not of such matters as core proceedings pursuant to 28 U.S.C. § 157 or otherwise; (d) a waiver or release of Pioneer Square's right to have, or to assert that, any and all final orders in any and all matters or proceedings be entered only after *de novo* review by a judge of the United States District Court; (e) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim, any objection thereto or other proceeding which may be commenced in this case or otherwise involving Pioneer Square; (f) an election of remedies or choice of law; (g) a waiver or release of, or any limitation on Pioneer Square's right to assert that amounts owed to Pioneer Square, including any portion of the claims asserted herein, are entitled to treatment as priority claims or as administrative claims, including pursuant to §§ 503(b) and 507(a) of the Bankruptcy Code; or (h) a waiver of any rights, claims, actions or defenses, setoffs, recoupments, or other matters to which Pioneer Square is entitled under any agreements, at law, in equity, or otherwise.

8.    This Proof of Claim is filed to preserve any and all rights and entitlements that Pioneer Square may have against the Debtor or its estate, and nothing set forth herein should be construed as an admission or waiver by Pioneer Square.

507286616.4

# Exhibit 1

# STADIUM PLACE WEST
## 201 King Street
## Seattle, Washington 98104

---

## LEASE AGREEMENT

## BETWEEN

## PIONEER SQUARE DEVELOPMENT LENDER, LLC,
### Landlord

## And

## QUALITY ATHLETICS, LLC,
### Tenant

# LEASE AGREEMENT

## Table of Contents

|  |  | Page |
|---|---|---|
| 1. | LEASE DATA AND EXHIBITS. | 1 |
| | a. Building. | 1 |
| | b. Premises. | 1 |
| | c. Tenant's Percentage of the Building. | 1 |
| | d. Commencement Date; Opening Date. | 1 |
| | e. Expiration Date. | 1 |
| | f. Base Rent. | 2 |
| | g. Intentionally Omitted. | 2 |
| | h. Security Deposit. | 2 |
| | i. Parking. | 2 |
| | j. Garbage and Recycling Areas. | 2 |
| | k. On-Site Storage. | 2 |
| | l. Notice Addresses: | 2 |
| | m. Exhibits. | 3 |
| 2. | PREMISES. | 3 |
| 3. | COMMENCEMENT AND EXPIRATION DATES | 3 |
| | a. Commencement Date. | 3 |
| | b. Confirmation of Commencement Date. | 3 |
| | c. Expiration Date. | 3 |
| 4. | RENT. | 3 |
| 5. | SECURITY DEPOSIT. | 3 |
| 6. | USES. | 4 |
| 7. | SERVICES AND UTILITIES. | 5 |
| 8. | PERSONAL PROPERTY TAXES. | 7 |
| 9. | TENANT IMPROVEMENTS. | 7 |
| 10. | ALTERATIONS. | 8 |
| 11. | CARE OF PREMISES. | 9 |
| | a. Tenant's Maintenance. | 9 |
| | b. Landlord's Maintenance. | 9 |
| 12. | ACCEPTANCE OF PREMISES. | 9 |
| 13. | ACCESS. | 9 |
| 14. | DAMAGE OR DESTRUCTION | 10 |
| | a. Damage and Repair. | 10 |

|   | b. | Destruction During Last Year of Term. | 10 |
|---|----|---------------------------------------|----|
|   | c. | Business Interruption. | 10 |
|   | d. | Insurance on Tenant Improvements. | 10 |
|   | e. | Express Agreement. | 11 |

| 15. | WAIVER OF SUBROGATION. | 11 |
|-----|------------------------|----|

| 16. | INDEMNIFICATION. | 11 |
|-----|------------------|----|

| 17. | INSURANCE. | 11 |
|-----|------------|----|
|   | a. | Liability Insurance. | 11 |
|   | b. | Property Insurance. | 11 |
|   | c. | Insurance Policy Requirements. | 12 |
|   | d. | Landlord's Insurance. | 12 |

| 18. | ASSIGNMENT AND SUBLETTING. | 12 |
|-----|----------------------------|----|
|   | a. | Assignment or Sublease. | 12 |
|   | b. | Assumption of Obligations. | 13 |
|   | c. | Sublessee Obligations. | 13 |

| 19. | SIGNS. | 13 |
|-----|--------|----|

| 20. | LIENS AND INSOLVENCY. | 14 |
|-----|-----------------------|----|
|   | a. | Liens. | 14 |
|   | b. | Insolvency. | 14 |

| 21. | DEFAULT. | 14 |
|-----|----------|----|
|   | a. | Cumulative Remedies. | 14 |
|   | b. | Tenant's Right to Cure. | 14 |
|   | c. | Vacation and Abandonment. | 14 |
|   | d. | Landlord's Re-entry. | 15 |
|   | e. | Reletting the Premises. | 15 |
|   | f. | Waiver of Redemption Rights. | 15 |
|   | g. | Nonpayment of Additional Rent. | 15 |

| 22. | SUBORDINATION. | 16 |
|-----|----------------|----|

| 23. | SURRENDER OF POSSESSION. | 16 |
|-----|--------------------------|----|
|   | a. | Signs and Personal Property. | 16 |
|   | b. | Alterations. | 16 |

| 24. | NON-WAIVER. | 17 |
|-----|-------------|----|

| 25. | HOLDOVER. | 17 |
|-----|-----------|----|

| 26. | CONDEMNATION. | 17 |
|-----|---------------|----|
|   | a. | Entire Taking. | 17 |
|   | b. | Constructive Taking of Entire Premises. | 17 |
|   | c. | Partial Taking. | 17 |

889989.07

     d.     Awards and Damages. .................................................................................17

27.    NOTICES. ..........................................................................................................18

28.    COSTS AND ATTORNEYS' FEES. ................................................................18

29.    LANDLORD'S LIABILITY. ..............................................................................18

30.    LANDLORD'S CONSENT. ...............................................................................18

31.    ESTOPPEL CERTIFICATES. ..........................................................................18

32.    OPTION TO RENEW. ......................................................................................19

33.    TRANSFER OF LANDLORD'S INTEREST. ..................................................20

34.    QUIET ENJOYMENT. .....................................................................................20

35.    RIGHT TO PERFORM. ....................................................................................20

36.    AUTHORITY. ...................................................................................................21
     a.     Company Authority. .............................................................................21
     b.     Partnership Authority. .........................................................................21

37.    TENANT FINANCING. ....................................................................................21

38.    INTENTIONALLY OMITTED. .......................................................................21

39.    FUTURE DEVELOPMENT. ............................................................................21

40.    INTENTIONALLY OMITTED. .......................................................................21

41.    GENERAL. ........................................................................................................21
     a.     Headings. ..............................................................................................21
     b.     Heirs and Assigns. ..............................................................................21
     c.     Brokers. ................................................................................................21
     d.     Rules and Regulations. ........................................................................22
     e.     Entire Agreement. ................................................................................22
     f.     Severability. .........................................................................................22
     g.     Overdue Payments. .............................................................................22
     h.     Force Majeure. ....................................................................................22
     i.     Right to Change Public Spaces. ..........................................................22
     j.     Compliance With Americans With Disabilities Act. ..........................23
     k.     Hazardous Materials. ..........................................................................23
     l.     Definition of Business Days. ...............................................................24
     m.     Governing Law. ..................................................................................24
     n.     Building Name. ....................................................................................24

# LEASE AGREEMENT

THIS LEASE AGREEMENT (the "Lease") made effective this ⅂ day of March, 2014, between PIONEER SQUARE DEVELOPMENT LENDER, LLC, a Washington limited liability company ("Landlord"), and QUALITY ATHLETICS, LLC, a Washington limited liability company ("Tenant").

As parties hereto, Landlord and Tenant agree:

**1.    LEASE DATA AND EXHIBITS.** The following terms as used herein shall have the meanings provided in this Section 1, unless otherwise specifically modified by provisions of this Lease.

**a. Building.**    Base Unit (the "Building") of the Stadium Place Master Condominium located at 201 King Street, Seattle, King County, Washington 98104 (the "Condominium") (hereinafter, the Building and Condominium are collectively called the "Property"). The Building is more particularly described on Exhibit A attached hereto and incorporated herein by reference.

**b. Premises.** The "Premises" are known as a portion of Suite Retail W (also known as Suite West), and contain approximately 3,868 rentable square feet on the first floor of the Building, as shown on the Building Plan and Floor Plan attached hereto as Exhibits B and B-1 and incorporated herein by reference. In addition, the Premises shall include an adjacent outside patio to the north and west for a seating area (the "Outside Seating Area"), as shown on Exhibit B; provided, however, that Tenant obtains, at its sole cost and expense, all necessary permits for the Outside Seating Area from the City of Seattle. No Base Rent, Operating Costs and Additional Rent (all as hereinafter defined) shall be payable on the Outside Seating Area.

**c. Tenant's Percentage of the Building.** The actual rentable square footage of the Premises shall be calculated by Landlord's architect using BOMA Standard ANSI/BOMA Z65.1 - 2010. "Tenant's Percentage of the Building" will be calculated as the rentable square footage of the Premises not including the Outside Seating Area, divided by the rentable square footage of the Building, which is 260,549 square feet, and does not include any exterior portions of the Property. In the event the rentable square footage of the Premises not including the Outside Seating Area or the rentable square footage of the Building, as calculated using BOMA standards, is altered during the term of the Lease, Landlord shall adjust "Tenant's Percentage of the Building" to properly reflect such changes.

**d. Commencement Date; Opening Date.** This Lease shall commence on March 15, 2014 (the "Commencement Date"), unless otherwise agreed to in writing by Landlord and Tenant; provided, however, that Base Rent shall commence one hundred fifty (150) days from the date Tenant's building permits have been approved by, and ready to be picked up from, the City of Seattle (the "Rent Commencement Date").

**e. Expiration Date.** Fifteen (15) years following the Commencement Date, with one option to renew at five (5) years, at the fair market value rental rate determined in accordance with Section 32 hereof.

Case 23-11119-MLB    Claim 78    Filed 02/15/24    Desc Main Document    Page 17 of 102    Exh. A-13

**f. Base Rent.** The annual rental amounts set forth below (the "Base Rent") are payable in equal monthly installments on or before the first day of each month commencing on the Rent Commencement Date; provided, however, that the first months' Base Rent is due upon Tenant's execution of this Lease. Additional Rent (as hereinafter defined) shall be adjusted from time to time as provided in Section 7 hereof.

| Lease Years: | Rent Per Rentable Square Feet: |
|---|---|
| Free Rent Period (3/15/2014 - Rent Commencement Date) | $0.00 |
| Rent Commencement Date - 01/16/2017 | $30.00 |
| 01/17/2017 - 01/16/2022 | $35.00 |
| 01/17/2022 - 01/16/2026 | $37.50 |
| 01/17/2026 - 01/16/2029 | $40.00 |

**g. Intentionally Omitted.**

**h. Security Deposit.** Nine Thousand Four Hundred Thirty Seven and 50/100 Dollars ($9,437.50) (*i.e.,* equal to first months' Base Rent).

**i. Parking.** Tenant shall have the right, but not the obligation, to lease up to four (4) parking stalls in the Building's parking garage for management on an unassigned basis at the resident monthly rates as established by Landlord from time to time. The leasing of parking stalls by Tenant shall be subject to such reasonable rules and regulations as Landlord or its parking operator may adopt from time to time. In addition, Landlord represents and warrants that a minimum of fifty (50) parking stalls located on the first floor of the Building's parking garage shall always be allocated to the commercial portion of the Building non-exclusively and available for retail customers of the Building on a non-exclusive first come first served basis.

**j. Garbage and Recycling Areas.** Landlord agrees to provide, at no additional charge to Tenant for Tenant's exclusive use throughout the Lease Term, the areas outlined on Exhibit B-1 for Tenant's garbage and recycling containers.

**k. On-Site Storage.** Landlord shall provide Tenant with storage space (the "Storage Space") on a month-to-month basis of a mutually agreed upon size and location for Tenant's auxiliary storage. Rent for the Storage Space shall be the fair market rental value for similar sized storage space leased to third parties in the area where the Building is located.

**l. Notice Addresses:**

Landlord: Pioneer Square Development Lender, LLC
2401 Utah Avenue South, Suite 305
Seattle, WA 98134

Tenant: Quality Athletics, LLC
4511 Shilshole Avenue Northwest
Seattle WA 98107
Attn: Josh Henderson

With a copy to:
David Herrman
Cairncross & Hempelmann
524 Second Avenue, Suite 500
Seattle, WA 98104-2323

**m. Exhibits.** The following exhibits or riders are made a part of this Lease:

| Exhibit A: | Legal Description of the Property |
| Exhibit B: | Building Plan |
| Exhibit B-1: | Floor Plan |
| Exhibit C: | Memorandum of Lease |
| Exhibit D: | Estimated Operating Costs |
| Exhibit E: | Tenant Improvements |
| Exhibit F: | Schedule of Submission of Tenant's Plans |

2. **PREMISES.** Landlord does hereby lease to Tenant, and Tenant does hereby lease from Landlord, upon the terms and conditions herein set forth, the Premises described in Section 1.b hereof, as shown on Exhibits B and B-1, together with the appurtenances, including without limitation the right to use, in common with others, the lobbies and other common areas in and about the Building.

3. **COMMENCEMENT AND EXPIRATION DATES.**

a. **Commencement Date.** The Commencement Date shall be the date specified in Section 1.d hereof.

b. **Confirmation of Commencement Date.** At Landlord's or Tenant's request, the parties will execute a Memorandum of Lease, in the form attached hereto as Exhibit C and incorporated herein by this reference, and to punctually cause same to be recorded at Landlord's expense.

c. **Expiration Date.** The Lease shall expire on the date specified in Section 1.e hereof.

4. **RENT.** Tenant shall pay Landlord, without notice, the Base Rent stated in Section 1.f hereof and Additional Rent as provided in Section 7, and any other additional payments due under this Lease in lawful money of the United States in advance on or before the first day of each month at Landlord's Notice Address set forth in Section 1.l hereof, or to such other party at such other place as Landlord may hereafter from time to time designate in writing. Base Rent and Additional Rent for any partial month at the beginning or end of the Lease term shall be adjusted for the proportionate fraction of the month. The first month's Base Rent is due upon Tenant's execution of this Lease.

5. **SECURITY DEPOSIT.** As security for the full and faithful performance of every covenant and condition of this Lease to be performed by Tenant, Tenant has paid to Landlord the Security Deposit as specified in Section 1.h hereof, the receipt of which is hereby acknowledged. If Tenant shall default with respect to any material covenant or condition of this Lease, including but not limited to the payment of Base Rent, Additional Rent or any other payment due under this Lease beyond any applicable notice and cure period, Landlord may apply

all or any part of the Security Deposit to the payment of any sum in default or any other sum which Landlord may be required or may in its reasonable discretion deem necessary to spend or incur by reason of Tenant's default. In such event, Tenant shall, within five (5) days of written demand therefore by Landlord, deposit with Landlord the amount so applied. Provided that if any outstanding default by Tenant has been cured, the amount of the Security Deposit then held by Landlord shall be repaid to Tenant (or, at Landlord's option, to the last assignee of Tenant's interest hereunder) within thirty (30) days after the expiration or sooner termination of this Lease. In the event of Tenant's default under this Lease, Landlord's right to retain the Security Deposit shall be deemed to be in addition to any and all other rights and remedies at law or in equity available to Landlord. Landlord shall not be required to keep any Security Deposit separate from its general funds in an interest-bearing account, and Tenant shall not be entitled to any interest thereon.

6.    **USES.** The Premises are to be used only for purpose of conducting therein (a) a restaurant with a sports bar theme which serves food and wine, beer and liquor (provided that Tenant obtains a Class H Liquor License), (b) the preparation of food for offsite catering, (c) general office use, and (d) the retail sale of general merchandise bearing the logo or brand of the business operated by Tenant at the Premises (collectively, the "Permitted Uses"), and for no other business or purpose without the prior written consent of Landlord, which consent may not be unreasonably withheld, conditioned, or delayed; provided that Landlord may withhold its consent if Landlord, in its commercially reasonable discretion, determines that any proposed use is inconsistent with or detrimental to the maintenance and operation of the Building as a first class retail facility or is inconsistent with any reasonable restriction on use of the Premises or the Property contained in any lease, mortgage or other agreement or instrument by which the Landlord is bound or to which any of such property is subject. Tenant shall be open for business in the Premises for a minimum of eight (8) hours a day, six (6) days a week, provided however, Tenant is not required to be open for holidays observed by the State of Washington, Christmas Eve, New Year's Eve and other major holidays as determined by Tenant in its reasonable discretion.

Tenant shall, at its own cost and expense, obtain any and all licenses and permits necessary for its use of the Premises for the Permitted Uses, including a Class H Liquor License.

Except for the Permitted Uses, Tenant shall not commit any act that will unreasonably increase the then existing rate of insurance on the Building without Landlord's consent. Tenant shall promptly pay upon demand the amount of any increase in insurance rates caused by any act or acts of Tenant.

In addition, Tenant shall not commit or allow to be committed any waste upon the Premises, or any public nuisance or other act which unreasonably disturbs other tenants in the Building and Condominium or which is unlawful, and shall promptly comply with all governmental orders and directives including, but not limited to, those of health or building inspections and/or fire marshals and those regarding the correction, prevention and abatement of nuisances in or upon, or connected with, the Premises, all at Tenant's sole expense to the extent the waste, public nuisance, or act was committed by Tenant. Tenant shall comply with all requirements of the American With Disabilities Act (ADA) with respect to the Premises except for those obligations which are the Landlord's. Except for those normally associated with the Permitted Use, Tenant shall not permit any other odors, smoke, dust, gas, noise or vibrations to emanate from the Premises, nor take any other action which would constitute a nuisance or would unreasonably disturb or endanger any person or any other property. If noise in excess of

- 4 -

the normal noise associated with the Permitted Uses and emanating from the Premises should unreasonably disturb other tenants in the Building or Condominium, then Tenant shall provide adequate insulation or take other commercially reasonable action as may be reasonably necessary to mitigate the disturbance. It is the intent of the parties that nothing contained in this Lease is intended to prohibit any noise or odors commonly associated with the Permitted uses. In addition to any other remedies Landlord may have for a breach by Tenant of the terms of this Section 6, Landlord shall have the right to have Tenant evicted from the Premises in accordance with applicable law. In addition, without Landlord's prior written consent, Tenant shall not receive, store or otherwise handle any product, material or merchandise which is explosive or highly flammable, except to the extent customarily associated with the Permitted Uses and used in accordance with applicable law.

Landlord represents and warrants that the Premises are not subject to any agreements or restrictions that would adversely affect Tenant's ability to use the Premises for the Permitted Uses. In addition, Landlord covenants and agrees that, for so long as Tenant is operating a restaurant with a sports bar theme in the Premises pursuant to this Lease, Landlord will not lease, license, or allow to be used any space in the Building, to any tenant/occupant with the same primary focus of business. As of the date of this Lease and except for this Lease, Landlord represents and warrants to Tenant that Landlord has not leased any portion of the Building (or any other restricted property pursuant this Lease) to any other party which specifically focuses on a sports bar themed restaurant.

7. **SERVICES AND UTILITIES.** In addition to the Base Rent provided in Section 1.f of this Lease, Tenant shall pay to Landlord its proportionate share of the following "Operating Costs" as "Additional Rent", determined in accordance with generally accepted real estate accounting and management practices consistently applied: (i) any and all real property taxes, regular and special assessments, license fees and other charges of any kind and nature whatsoever, payable by Landlord as a result of any public or quasi-public authority, private party, or owner's association levy, assessment or imposition against, or arising out of Landlord's ownership or interest in the Building, (ii) the commercially reasonable costs of operating and maintaining (exclusive of replacements or major repairs) the non-structural common areas of the Building, (iii) insurance premiums for insurance maintained by Landlord for the Building, and (iv) commercially reasonable and market rate administrative or management fees incurred by Landlord in the operation of the Building (all of the foregoing are hereinafter collectively referred to as the "Operating Costs"). Operating Costs shall not include depreciation, amortization, capital expense costs or major repairs to the Building or Condominium shell, *i.e.* Building structure, including exterior walls, roof and floor and foundation, costs to comply with the Americans With Disabilities Act or other governmental regulations, legal fees, costs to remediate environmental problems. During each month of the Lease term, Tenant shall make a monthly escrow deposit to Landlord (the "Escrow Payment") equal to one-twelfth (1/12) of Tenant's Percentage of the Building multiplied by the total amount of Operating Costs which will be due and payable for that particular calendar year. Tenant authorizes Landlord to use the funds deposited by Tenant with Landlord under this paragraph to pay the Operating Costs. Each Escrow Payment shall be due and payable, as Additional Rent. The initial Escrow Payment is based upon Tenant's proportionate share of the estimated charges for the calendar year in which the Commencement Date occurs, and the monthly Escrow Payment is subject to increase or decrease as reasonably determined by Landlord to reflect the accurate amount of Tenant's estimated proportionate share of the Operating Costs. The Escrow Payment account of Tenant

shall be reconciled annually within one hundred twenty (120) days after the end of each calendar year and Landlord shall provide Tenant a statement ("Operating Cost Statement") setting forth the amount of Operating Costs actually incurred and the amount of Tenant proportionate share of the Operating Costs actually payable by Tenant with respect to such calendar year. If Tenant's total Escrow Payments are less than Tenant's actual proportionate share of the Operating Costs, Tenant shall pay to Landlord within thirty (30) days following demand the difference. If Tenant's total Escrow Payments are more than Tenant's actual proportionate share of the Operating Costs, Landlord shall retain such excess and credit it to Tenant's Escrow Payment account for the successive year's Operating Costs unless the term of this Lease as expired or been terminated in which case Landlord will mail the credit to Tenant within thirty (30) days after the annual reconciliation is completed. Notwithstanding the foregoing, the Operating Costs for the first year of the term of this Lease shall not exceed Eight and 00/100 Dollars ($8.00) per rentable square foot. A copy of Landlord's estimate of said first years' Operating Costs is attached hereto as Exhibit D and incorporated herein by this reference.

If Tenant disputes any amount shown on the Operating Cost Statement, Tenant may audit Landlord's books and records for the calendar year covered by such Operating Cost Statement upon written notice to Landlord given within ninety (90) days after Tenant's receipt of such Operating Cost Statement. Any audit conducted by Tenant shall be completed within sixty (60) days after Tenant's request. In the event the amount of Tenant's proportionate share of Operating Costs exceeds the sum of monthly installments actually paid by Tenant for such calendar year, Tenant shall pay to Landlord the difference within thirty (30) days following completion of the audit. In the event the sum of the monthly installments actually paid by Tenant for such calendar year exceeds the amount of Tenant proportionate share of Operating Expenses actually due and owing in accordance with this Lease, the difference shall be applied as a credit to Tenant's future proportionate share of Operating Costs payable by Tenant pursuant to this Lease, or if the term has expired, the excess shall be refunded to Tenant within thirty (30) days after completion of the audit. Landlord and Tenant shall cooperate as may be reasonably necessary in order to facilitate the timely completion of the audit.

If Tenant should fail to pay any Escrow Payment required to be paid by Tenant hereunder, in addition to any other remedies provided herein, Landlord may, if it so elects, pay such Escrow Payment. Any sums so paid by Landlord plus interest at the rate set forth in Section 41.g below from the date of payment by Landlord until repaid by Tenant, shall be Additional Rent owing by Tenant to Landlord and due and payable upon demand.

If at any time during the Lease term, the present method of taxation shall be changed so that in lieu of the whole or any part of any taxes, assessments, fees or charges levied, assessed or imposed on real estate and the improvements thereon shall be levied, assessed or imposed on Landlord a capital levy or other tax directly on the rents received therefrom and/or a franchise tax, assessment, levy or charge measured or based in whole or in part, upon such rent on the present or any future improvements then all such taxes, assessments, fees or charges, or the part thereof so measured or based, shall be deemed to be included within the term "Charges" for the purpose hereof.

Operating Costs which may be incurred by Landlord at its reasonable discretion shall include, but not be limited to, those costs for the Building, incurred for lighting, water, and

sewage (exclusive of replacements and major repairs) to the extent not separately metered and payable directly by Tenant, trash removal, exterior painting, exterior window cleaning, roof maintenance and repairs (but not replacements or major repairs), janitorial, parking area sweeping, property management (subject to the limitations under this Lease), accounting, security, inspecting, sewer lines, plumbing, paving, resurfacing and restriping of the parking area and commercially reasonable and market administration or management fees (but not both). Landlord's management and administrative fees combined shall not exceed five percent (5%) of the total Operating Costs, exclusive of taxes and insurance.

Any payment to be made pursuant to this Section 7 with respect to the calendar year in which this Lease commences or terminates shall bear the same ratio to the payment which would be required to be made for the full calendar year as that part of such calendar year covered by the Lease term bears to a full calendar year.

All direct costs for heat, light, water and sewer and all other public utilities which shall be used in or charged against the Premises during the term of this Lease or any Extended Term (as hereinafter defined), shall be billed directly to, and paid for by, or paid directly by Tenant.

**8.     PERSONAL PROPERTY TAXES.** Tenant shall pay, prior to delinquency, all Personal Property Taxes payable with respect to all personal property of Tenant located on the Premises or the Building and promptly, upon request of Landlord, shall provide written proof of such payment. As used herein, "personal property of Tenant" shall include all improvements which are paid for by Tenant. "Personal Property Taxes" shall include all property taxes assessed against the property of Tenant, whether assessed as real or personal property.

**9.     TENANT IMPROVEMENTS.** Landlord shall deliver the Premises to Tenant, and Tenant agrees to accept the same, in an "AS-IS" and "WHERE-IS" condition, except as otherwise set forth in this Section 9 or in the Lease.

Landlord shall construct (the "Landlord's Work") all of the improvements to the Premises (the "Tenant Improvements") described on Exhibit E attached hereto and incorporated herein by this reference (subject to delays or conditions beyond Landlord's control), except for that portion of the Tenant Improvements indicated on Exhibit E to be completed by Tenant and all other work required to make the Premises suitable for the Permitted Uses ("Tenant's Work"). The Landlord's Work shall be completed prior to the Commencement Date. Tenant shall use commercially reasonable efforts, subject to delays and conditions beyond Tenant's reasonable control, to complete the Tenant's Work by the Rent Commencement Date based on design plans prepared by Tenant's architects (the "Tenant's Plans") (and submitted to Landlord pursuant to the schedule attached hereto as Exhibit F and incorporated herein by this reference) and approved by Landlord (which approval will not be unreasonably withheld, conditioned, or delayed), and shall be performed by Landlord's contractor, JTM Construction, or a licensed and experienced general contractor selected by Tenant and approved by Landlord, which approval, to be based, in part, on cost and availability, will not be unreasonably withheld. Notwithstanding the foregoing, prior to Tenant's submission of the Tenant's Plans to Landlord for approval, Tenant shall first obtain the written consent and approval of such Tenant's Plans from the Public Health Department of Seattle and King County to the extent required. Thereafter, Landlord shall submit such Tenant's Plans to the Department of Planning and Development for approval. Tenant may change the Tenant's Plans subject to the requirements of this Section.

889989.07

The Tenant's Work shall be made to match existing Building standards, and shall be constructed in a good and workmanlike manner in accordance with all applicable codes, laws, ordinances, regulations and all other applicable laws. Landlord represents and warrants to Tenant that the Premises and Building are fit and suitable for the Permitted Uses, that the Permitted Uses may be maintained upon the Premises throughout the term of this Lease, and that there are no structural or other deficiencies or defects with the Building.

Prior to the construction of Tenant's storefront, Landlord shall have the right to review and approve all of Tenant's storefront designs, including its awnings, signs (as hereinafter provided), parapets and trade colors. Landlord will not unreasonably withhold, delay or condition its approval of Tenant's professionally designed, lawfully permitted storefront design. In this regard, Tenant acknowledges that all storefront designs are subject to the approval of the Pioneer Square Preservation Board and applicable city building codes over which Landlord has no control.

Landlord agrees to pay Two Hundred and 00/100 Dollars ($200.00) per rentable square foot of the Premises (the "Tenant Improvement Allowance") towards the cost of the Tenant's Work and associated professional fees and permits, which Tenant Improvement Allowance shall be utilized prior to any direct payments by Tenant. Payments of the Tenant Improvement Allowance will be made for all work performed upon Landlord's receipt from Landlord's designated architect (whose contact information shall be provided to Tenant upon execution of this Lease) of a report that the Tenant's Work, for which payment is being requested, has been performed in accordance with the plans and specifications, approved in accordance with this Section 9, and subject to all building codes. The architect's report shall not be unreasonably withheld and shall be provided by the architect to the Landlord within fifteen (15) days after Landlord's receipt of Tenant's request for the applicable progress payment. After full disbursement of the Tenant Improvement Allowance, the remaining cost of the Tenant's Work, if any, shall be paid by Tenant.

**10. ALTERATIONS.** Tenant may construct interior changes to the Premises to accommodate Tenant's business (the "Alterations"), provided, however, that (i) Tenant first notifies Landlord in writing at least thirty (30) business days prior to the commencement of any Alterations and obtains Landlord's approval, which shall not be unreasonably withheld, and (ii) the Alterations do not materially and adversely affect, disturb, or in any way change, the structural integrity, life safety and mechanical, electric or plumbing integrity and services of the Premises and the Building. All such Alterations shall be at the sole cost and expense of Tenant and shall be performed by contractors or mechanics approved by Landlord, which approval will not be unreasonably withheld, conditioned, or delayed. All work with respect to any such Alterations shall be done in a good and workmanlike manner, shall be of a quality equal to or exceeding the then existing construction standards for the Building and must be of a type, and the floors and ceilings must be finished in a manner, customary for a similar first class facility in the vicinity or consistent with the existing finishes in place at the Premises or Building. Such Alterations shall be diligently prosecuted to completion. All such Alterations shall be made strictly in accordance with all laws, regulations and ordinances relating thereto, and no interior improvements installed by Landlord in the Premises may be removed unless the same are promptly restored to a condition similar or better. Tenant agrees to allow Landlord to enter the Premises at reasonable times and post appropriate notices to avoid liability to contractors or material suppliers for payment for such Alterations.

- 8 -

Tenant shall reimburse Landlord for any reasonable sums expended by Landlord for examination and approval of architectural or mechanical plans and specifications of the Alterations. The foregoing reimbursement obligations of tenant shall not exceed the total sum of One Thousand Five Hundred and 00/100 Dollars ($1,500.00) for each project. Tenant shall also reimburse Landlord for reasonable direct costs incurred during any inspection of the Alterations. All damages or injury done to the Premises or Building by Tenant or by any persons who may be in or upon the Premises or Building with the express or implied consent of Tenant, including but not limited to the cracking or breaking of any glass of windows and doors, shall be paid for by Tenant and Tenant shall pay for all damage to the Building caused by negligent acts or omissions of Tenant or Tenant's officers, contractors, agents, invitees, licensees, or employees.

11.     **CARE OF PREMISES.**

        **a. Tenant's Maintenance.**  Tenant shall, throughout the term of this Lease, maintain the non-structural interior of the Premises and the Outside Seating Area in good condition and repair, subject to reasonable wear and tear. Tenant is also responsible for all snow and ice removal in the Outside Seating Area; provided, however, the snow and ice removal for the sidewalk and adjacent areas along King Street are Landlord's responsibility.

        **b. Landlord's Maintenance.**  Notwithstanding anything to the contrary in the Lease, Landlord shall make, at its sole cost and expense, all repairs and replacements and perform all maintenance necessary to keep the exterior of the Premises and the Building in good working order and repair and to maintain the Building and the exterior of the Premises in a clean, safe and tenantable condition comparable to other similar first-class buildings in Seattle, Washington. These maintenance, repair and replacement obligations shall include without limitation the roof, foundation, exterior walls, interior structural walls, all structural components, doors, elevators, utility lines, all systems, equipment, windows, and facilities serving the Premises and the Building, such as mechanical, electrical, HVAC, plumbing and sewer, replacement of lighting tubes, lamp ballasts and bulbs, and extermination and pest control when necessary, and snow and ice removal, unless such repair is specified as Tenant's responsibility pursuant to Section 11.a. Landlord's work under this Section 11 shall be accomplished with the least possible amount of interference with Tenant and the conduct of Tenant's business.

12.     **ACCEPTANCE OF PREMISES.**  Tenant shall be deemed to have accepted the Premises in their current condition, except as otherwise provided in this Lease.

13.     **ACCESS.**  Tenant shall permit Landlord and its agents to enter into and upon the Premises at all reasonable times upon timely notice to Tenant of no less than twenty-four (24) hours, except in emergencies where only notice after the fact shall be provided to Tenant, for the purpose of inspecting the same or for the purpose of cleaning, repairing, altering or improving the Premises or the Buildings. Nothing contained in this Section 13 shall be deemed to impose any obligation upon Landlord not expressly stated elsewhere in this Lease. When reasonably necessary, Landlord may temporarily close entrances, doors, corridors, elevators or other facilities for a reasonable duration, without liability to Tenant by reason of such closure and without such action by Landlord being construed as an eviction of Tenant or release of Tenant from the duty of observing and performing any of the provisions of this Lease. Landlord shall have the right to enter the Premises upon timely notice to Tenant, except in emergencies, for the purpose of showing the Premises to prospective tenants within the period of one hundred eighty (180) days prior to the expiration or sooner termination of the Lease term. Landlord will use its

best efforts to minimize the impact on Tenant's business of any entry by Landlord or its agents or contractors on the Premises.

## 14. DAMAGE OR DESTRUCTION.

**a. Damage and Repair.** If the Building or the Premises are damaged by fire or any other cause to such extent that the cost of restoration, as reasonably estimated by Landlord, will equal or exceed sixty-five percent (65%) of the replacement value of the Building (exclusive of foundations) just prior to the occurrence of the damage, or if insurance proceeds sufficient for restoration are for any reason unavailable, then Landlord may no later than the sixtieth (60th) day following the damage, give Tenant a notice of Landlord's election to terminate this Lease. In the event of such election this Lease shall be deemed to terminate on the third day after the giving of such notice, and Tenant shall surrender possession of the Premises within a reasonable time thereafter, and the Base Rent and Additional Rent shall be apportioned as of the date of Tenant's surrender and any Base Rent and Additional Rent paid for any period beyond such date shall be repaid to Tenant. If the cost of restoration as estimated by Landlord shall amount to less than fifty percent (50%) of said replacement value of the Building and insurance proceeds sufficient for restoration are available, or if Landlord does not elect to terminate this Lease, Landlord shall restore the Building and the Premises (to a functional unit similar to the Premises prior to such damages) with reasonable promptness, subject to delays beyond Landlord's control and delays in the making of insurance adjustments by Landlord, and Tenant shall have no right to terminate this Lease except as provided in this Section 14. If the Premises are to be restored, the Base Rent and Additional Rent shall be reduced, based on the proportion of the square footage of the Premises rendered untenantable or usable in the Tenant's reasonable judgment, except in the event such damage resulted from or was contributed to, directly or indirectly, by the act, or negligence of Tenant, Tenant's officers, contractors, agents, employees, invitees or licensees, in which event Base Rent and Additional Rent shall abate except to the extent Landlord receives proceeds from any rental income insurance policy specifically intended to compensate Landlord for the loss of Rent hereunder.

**b. Destruction During Last Year of Term.** In case the Building shall be substantially destroyed by fire or other cause at any time during the last year of this Lease, either Landlord or Tenant may terminate this Lease by written notice to the other party.

**c. Business Interruption.** No damages, compensation or claim shall be payable by Landlord for inconvenience, loss of business or annoyance arising from any repair or restoration of any portion of the Premises or the Building except to the extent the repair or restoration was due to the misconduct or negligence of Landlord or any of its agents, employees, contractors, or other tenants. Landlord shall use commercially reasonable efforts to effect such repairs promptly.

**d. Insurance on Tenant Improvements.** Landlord will not be required to carry insurance of any kind for any Tenant improvement or for Tenant's furniture, furnishings, fixtures, equipment or appurtenances of Tenant under this Lease, and Landlord shall not be obligated to repair any damage thereto or replace the same, unless such damage is caused by Landlord's negligence or willful misconduct.

- 10 -

**e. Express Agreement.** The provisions of this Section 14 shall be considered an express agreement governing any case of damage or destruction of the Building or Premises by fire or other casualty.

**15.   WAIVER OF SUBROGATION.**   Whether any loss or damage to the Premises, the Building, or any property therein, is due to the negligence of either Landlord or Tenant, their agents or employees, or any other cause, Landlord and Tenant do each hereby waive any rights each may have against the other on account of any loss or damage arising from any risk actually covered by insurance policies held by the damaged party.   Each party shall use best efforts to cause its insurance carriers to consent to the foregoing waiver of rights of subrogation against the other party.   This clause shall be effective if, and only to the extent, that it does not impair any insurance carried by either party, only if the required waiver of subrogation endorsements can be obtained at a commercially reasonable cost, and only to the extent of proceeds actually received.

**16.   INDEMNIFICATION.**   Subject to any limitations set forth under this Lease, each party shall indemnify and hold the other harmless from and against all common law or statutory liabilities, damages, injuries, obligations, losses, claims, civil actions, costs, or expenses, including attorneys' fees, arising with respect to any act, omission, or negligence of its officers, contractors, licensees, agents, servants, employees, guests, or invitees, in or about the Building or the Premises or with respect to any breach or default under this Lease.   As part of such indemnity, each party waives its immunity from suit under the provisions of RCW 51, *et seq.*

Neither party shall be liable for any loss or damage to persons or property sustained by the other party or other persons, which may be caused by theft, or by any act or neglect of any tenant or occupant of the Building or any other third parties unless such loss or damage is due to the other party's negligence.

In the event any indemnification hereunder is in connection with or collateral to a contract or agreement relative to the construction, alteration, repair, addition to, subtraction from, improvement to or maintenance of the Premises or the Building, such indemnification shall be subject to the provisions of RCW 4.24.115.

**17.   INSURANCE.**

**a. Liability Insurance.**   Tenant shall, throughout the term of this Lease and any renewal hereof, at its own expense, keep and maintain in full force and effect, a policy of comprehensive general liability insurance including a contractual liability endorsement covering Tenant obligations under Section 16, insuring Tenant's activities upon, in or about the Premises or the Property, against claims of bodily injury or death or property damage or loss with a limit of not less than Two Million Dollars ($2,000,000.00) combined single limit.

**b. Property Insurance.**   Tenant shall throughout the term of this Lease and any renewal hereof at its own expense, keep and maintain in full force and effect, what is commonly referred to as "Special Form" perils coverage insurance (including earthquake and flood) on the leasehold improvements constructed by Tenant in the Premises and on the personal property of Tenant in the Premises in an amount not less than the current one hundred percent (100%) replacement value thereof.

- 11 -

**c. Insurance Policy Requirements.** All insurance required to be carried by Tenant under this Section 17 shall be with Farmers Insurance, or with such other company as is reasonably approved by Landlord with an A. M. Best credit rating of A- or above. No insurance policy required under this Section 17 shall be cancelled or reduced in coverage and each insurance policy shall provide that it is not subject to cancellation or a reduction in coverage except after thirty (30) days prior written notice to Landlord.

Tenant shall deliver to Landlord on or before the Commencement Date and from time to time thereafter, copies of policies of such insurance or certificates evidencing the existence and amounts of same and naming Landlord as additional insured thereunder. In no event shall the limits of any insurance policy required under this Section 17 be considered as limiting the liability of Tenant under this Lease.

**d. Landlord's Insurance.** Landlord shall maintain at all times during the Lease term a policy or policies of property insurance with extended coverage endorsement covering the Building in an amount equal to the full replacement cost of the Building. Further, Landlord shall maintain at all times during the Lease term a policy or policies of commercial general liability, or a combination of commercial general liability and umbrella or excess liability insurance, with combined limits as determined to be appropriate by Landlord, but in no event less than Two Million Dollars ($2,000,000.00). The liability insurance required hereunder shall cover all of Landlord's operations and activities and all contingent liability of Landlord for all operations performed at the Building on Landlord's behalf by Landlord's contractors or subcontractors.

## 18.    ASSIGNMENT AND SUBLETTING.

**a. Assignment or Sublease.** Tenant shall not assign, mortgage, encumber or otherwise transfer this Lease or sublet the whole or any part of the Premises without in each case giving Landlord at least thirty (30) days' prior written notice of its intent to market the Premises for assignment of sublet (the "Assignment Notice"). Landlord shall have thirty (30) days after its receipt of the Assignment Notice to elect to terminate this Lease (the "Assignment Approval Period") by given written notice thereof to Tenant (the "Lease Termination Notice"), and this Lease shall automatically terminate ninety (90) days after Tenant's receipt of the Lease Termination Notice. If Landlord does not elect to terminate this Lease within the Assignment Approval Period, then Tenant shall have the right to sublet all or any portion of the Premises or assign its interest in this Lease, subject to Landlord's written consent of the proposed assignee, subtenant or other transferee. Such consent or approval of Landlord will not be unreasonably withheld, conditioned or delayed, except, (1) Landlord may withhold its consent if in Landlord's reasonable judgment the occupancy by any proposed assignee, subtenant or other transferee: (i) is not consistent with the maintenance and operation of a first class retail building due to the proposed occupant's nature or manner of conducting business, (ii) is likely to cause a material ongoing disturbance to the customary use and occupancy of the Building by other tenants, their employees, customers, clients and other guests or visitors, or (iii) is not reasonably deemed by Landlord to be financially responsible; (2) Landlord may withhold, in its absolute and sole discretion, consent to any mortgage, hypothecation, pledge or other encumbrance of any interest in this Lease by Tenant or any subtenant, whereby any interest under this Lease other than Tenant's leasehold interest becomes collateral for any obligation of Tenant or any other person; and (3) Landlord may withhold its consent to the extent Landlord determines necessary to comply with a reasonable restriction on use of the Premises or the Building contained in any lease, mortgage, or other agreement or instrument by which the Landlord is bound or to which

any of such property is subject copies of which are provided to Tenant in connection with Tenant's execution of this Lease.

No assignment, subletting or other transfer shall relieve Tenant of any liability under this Lease unless provided for in connection therewith. Consent to any such assignment, subletting or transfer shall not operate as a waiver of the necessity for consent to any subsequent assignment, subletting or transfer. In connection with an assignment or subletting, Tenant shall pay the reasonable cost of processing such assignment or subletting, including attorneys' fees, upon demand of Landlord in an amount not to exceed $500.00. Tenant shall provide Landlord with copies of all fully executed assignments, subleases and assumption instruments.

If Tenant is a corporation, any transfer of this Lease by any change in more than fifty percent (50%) of the ownership of Tenant shall constitute an assignment for the purpose of this Section 18.

If Tenant is a partnership, any transfer of this Lease by any change in the majority ownership of the partnership interests shall constitute an assignment for the purpose of this Section 18.

**b. Assumption of Obligations.** As a condition to Landlord's approval of any assignment and except as may otherwise be provided, any potential assignee otherwise approved by Landlord shall assume in writing all obligations of Tenant under this Lease and shall be jointly and severally liable with Tenant for the payment of Base Rent and Additional Rent and performance of all terms, covenants and conditions of this Lease.

**c. Sublessee Obligations.** Except as may otherwise be provided, any sublessee shall assume all obligations of Tenant as to the portion of the Premises which is subleased to such sublessee and shall be jointly and severally liable with Tenant for rental and other payments and performance of all terms, covenants and conditions of such approved sublease.

**19. SIGNS.** Subject to Landlord's prior written approval and compliance with the applicable laws, regulations, codes and ordinances noted below, Tenant shall be allowed to install signage on both the North and West façade of the Premises, as well as directional signage in the Building garage and elevators, if applicable. Tenant shall not inscribe any other inscription, or post, place, or in any manner display any other sign, graphics, notice, picture, placard or poster, or any advertising matter whatsoever upon the glass panes or supports of the windows and doors, or upon the exterior walls of the Premises or the Building, or at any places visible (either directly or indirectly as an outline or shadow on a glass pane) from anywhere outside the Premises without first obtaining Landlord's written consent thereto, such consent to be at Landlord's sole discretion. Any such consent by Landlord shall be upon the understanding and condition that Tenant shall remove the same at the expiration or sooner termination of this Lease and Tenant shall repair any damage to the Premises or the Building caused thereby. Notwithstanding the foregoing, Landlord shall not unreasonably withhold, condition or delay its approval to Tenant's professionally prepared, lawfully permitted exterior signage or awnings consistent with the Building's signage plan. Tenant agrees to comply with all applicable city, county and other governmental agency laws, regulations, codes and ordinances applicable to the installation of all external signage (including the Pioneer Square Preservation Board) over which Landlord has no control.

889989.07

## 20. LIENS AND INSOLVENCY.

**a. Liens.** Subject to the provisions of Section 37, Tenant shall keep its interest in this Lease, the Premises, the Building and any property of Tenant in the Premises (other than unattached personal property) free from all liens arising out of any work performed or materials ordered or obligations incurred or on behalf of Tenant and Tenant hereby indemnifies and holds Landlord harmless from any liability from any such lien. In the event any lien is filed against the Building by any person claiming by, through or under Tenant, Tenant shall, upon request of Landlord, at Tenant's expense, immediately either cause such lien to be released of record or furnish to Landlord a bond in form and amount and issued by a surety satisfactory to Landlord, indemnifying Landlord and the Property against all liability, costs and expenses, including attorneys' fees, which Landlord may incur as a result thereof. Provided that such bond has been furnished to Landlord, Tenant, at its sole cost and expense and after written notice to Landlord, may contest, by appropriate proceedings conducted in good faith and with due diligence, any lien, encumbrance or charge against the Premises or the Building arising from work done or materials provided to and for Tenant, provided such proceedings suspend the collection thereof against Landlord, and the Premises and the Building, and neither the Premises, the Building nor any part thereof or interest therein is or will be in any danger of being sold, forfeited or lost.

**b. Insolvency.** If Tenant becomes insolvent or voluntarily or involuntarily bankrupt, or if a receiver, assignee or other liquidating officer is appointed for the business of Tenant, and any such petition or appointment is not dismissed or withdrawn within sixty (60) days from filing, Landlord at its option may terminate this Lease and Tenant's right of possession under this Lease and in no event shall this Lease or any rights or privileges hereunder be an asset of Tenant in any bankruptcy, insolvency or reorganization proceeding.

## 21. DEFAULT.

**a. Cumulative Remedies.** All rights of Landlord and Tenant herein enumerated shall be cumulative, and none shall exclude any other right or remedy allowed by law. In addition to the other remedies in this Lease provided, either party shall be entitled to restrain by injunction the violation or attempted violation by the other party of any of the covenants, agreements or conditions of this Lease.

**b. Tenant's Right to Cure.** Except as provided otherwise herein, Tenant shall have a period of ten (10) business days from the day of written notice from Landlord to Tenant within which to cure any default in the payment of Base Rent, Additional Rent or other sums due hereunder. Each party shall have a period of thirty (30) days from the date of written notice from the other party within which to cure any other default hereunder; provided, however, that with respect to any such default which cannot be cured within thirty (30) days, the default shall not be deemed to be uncured if the defaulting party commences to cure within thirty (30) days and for so long as such party is diligently prosecuting the cure thereof.

**c. Vacation and Abandonment.** Vacation shall be defined as a prolonged, continuous absence from the Premises of at least ten (10) consecutive days without prior notice to Landlord. Abandonment shall be defined as an absence from the Premises of ten (10) business days or more while Tenant is in default after the expiration of all cure periods. Any vacation or abandonment by Tenant shall be considered a default with no right to cure, allowing Landlord to re-enter the Premises under Section 21.d.

**d. Landlord's Re-entry.** Upon an uncured default of this Lease by Tenant and subject to applicable laws, Landlord, besides other rights or remedies it may have, at its option, may enter the Premises or any part thereof, either with or without process of law, and expel, remove or put out Tenant or any other persons who may be thereon, together with all personal property found therein; and Landlord may terminate this Lease, or it may from time to time, without terminating this Lease and as agent of Tenant, rent the Premises or any part thereof for such term or terms (which may be for a term less than or extending beyond the term hereof), and at such rental or rentals and upon such other reasonable terms and prevailing market conditions , with the right to repair, renovate, remodel, redecorate, alter and change the Premises, Tenant remaining liable for any deficiency computed as hereinafter set forth. In the case of any default, re-entry and/or dispossession, by summary proceedings or otherwise, all Base Rent and Additional Rent shall become due thereupon and be paid up to the time of such reentry or dispossession together with such expenses as Landlord may reasonably incur for attorneys' fees, advertising expenses, brokerage fees and/or putting the Premises in good order or preparing the same for re-rental, together with interest thereon as provided in Section 41.g hereof, accruing from the date of any such expenditure by Landlord.

**e. Reletting the Premises.** At the option of Landlord, rents received by Landlord from such reletting shall be applied first to the payment of any indebtedness from Tenant to Landlord other than Base Rent and Additional Rent due hereunder; second, to the payment of any costs and expenses of such reletting and including, but not limited to, attorneys' fees, advertising fees and brokerage fees, and to the payment of any repairs, reasonable renovations, reasonable remodeling, reasonable redecoration, reasonable alterations and changes in the Premises; third, to the payment of Base Rent and Additional Rent due and to become due hereunder, and if after so applying said rents there is any: (i) deficiency in the Base Rent or Additional Rent to be paid by Tenant under this Lease, Tenant shall pay any deficiency to Landlord monthly on the dates specified herein and any payment made or suits brought to collect the amount of the deficiency for any month shall not prejudice in any way the right of Landlord to collect the deficiency for any subsequent month; and (ii) surplus, Landlord shall pay the surplus to Tenant monthly on the dates specified herein for the payment of Base Rent. The failure of Landlord to relet the Premises or any part or parts thereof shall not release or affect Tenant's ability hereunder. No such re-entry or taking possession of the Premises shall be construed as an election on Landlord's part to terminate this Lease unless a written notice of such intention be given to Tenant. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous breach and default. Should Landlord at any time terminate this Lease by reason of any default, in addition to any other remedy it may have, it may recover from Tenant any deficiency in the Base Rent and Additional Rent reserved in this Lease for the balance of the Term, plus all reasonable court costs and attorneys' fees incurred by Landlord in the collection of the same.

**f. Waiver of Redemption Rights.** Tenant, for itself, and on behalf of any and all persons claiming through or under it, including creditors of all kinds, does hereby waive and surrender all right and privilege which they or any of them might have under or by reason of any present or future law, to redeem the Premises or to have a continuance of this Lease for the term hereof, as it may have been extended, after having been dispossessed or ejected therefrom by process of law or under the terms of this Lease or after the termination of this Lease as herein provided.

**g. Nonpayment of Additional Rent.** All costs and expenses which Tenant assumes or agrees to pay to Landlord pursuant to this Lease shall be deemed Additional Rent

and, in the event of nonpayment thereof, Landlord shall have all the rights and remedies herein provided for in case of nonpayment of Base Rent.

**22.    SUBORDINATION.**    This Lease shall be subordinate to any first mortgage or deed of trust (and any other mortgage or deed of trust upon the written election of Landlord) now existing or hereafter placed upon the Building or the Premises, created by or at the instance of Landlord, and to any and all advances to be made thereunder and to interest thereon and all modifications, renewals and replacements or extensions thereof ("Landlord's Mortgage"), provided that, so long as Tenant is not in default under this Lease following the expiration of any applicable cure period, Tenant's peaceable possession of the Premises and its rights under this Lease will not be disturbed on account thereof.  In the event of any foreclosure or sale pursuant to the Landlord's Mortgage, Tenant agrees to attorn to such beneficiary or purchaser, provided that, so long as Tenant is not in default under this Lease following the expiration of any applicable cure period, Tenant's peaceable possession of the Premises and its rights under this Lease will not be disturbed on account thereof.  Tenant shall properly execute, acknowledge and deliver documents which the holder of any Landlord's Mortgage may reasonably require to effectuate the provisions of this Section 22.

**23.    SURRENDER OF POSSESSION.**    Subject to the terms of Section 14 relating to damage and destruction, upon expiration of the term of this Lease, whether by lapse of time or otherwise Tenant shall promptly and peacefully surrender the Premises to Landlord in as good condition as when received by Tenant from Landlord or as thereafter improved, reasonable use, wear and tear and damage by casualty, described in Section 14 excepted.  Notwithstanding the foregoing, Tenant shall not have any obligation to remove any Alterations, except as provided otherwise in Subsection b below.

**a.  Signs and Personal Property.**    Tenant shall remove (i) all identifying insignia and design elements which are unique to Tenant's business and installed by Tenant in or on the Premises, and (ii) all articles of personal property and all business and trade fixtures, machinery and equipment, furniture and movable partitions owned by Tenant or installed by Tenant at its expense in the Premises which can be removed without damage to the Premises at the expiration or sooner termination of this Lease.  Tenant shall pay Landlord for any damages for injury to the Premises or the Building resulting from such removal.  If Tenant shall fail to remove any of its property of any nature whatsoever from the Premises or the Building within ten (10) business days after the expiration or earlier termination of this Lease, Landlord may remove and store said property without liability for loss thereof or damage thereto, such storage to be for the account and at the expense of Tenant.  If Tenant shall not pay the cost of storing any such property after it has been stored for a period of thirty (30) days or more, Landlord may, at its option, sell, or permit to be sold, any or all such property at public or  sale, in such manner and at such times and places as Landlord in its sole discretion may deem proper, without notice to Tenant, unless notice is required under applicable statutes, and shall apply the proceeds of such sale: first, to the cost and expense of such sale, including reasonable attorneys' fees actually incurred; second, to the payment of the costs or charges for storing any such property; third, to the payment of any other sums of money which may then be or thereafter become due Landlord from Tenant under any of the terms hereof; and, fourth, the balance, if any, to Tenant.

**b.  Alterations.**    All Alterations shall remain in and be surrendered with the Premises as a part thereof at the expiration or earlier termination of this Lease, without disturbance, molestation or injury, provided that Landlord may, together with the written notice consenting to the construction of any such Alterations, notify Tenant that they must be removed

889989.07

upon the expiration or earlier termination of this Lease. In such event, all expense to remove such Alterations and to restore the Premises to standards, prior to such Alterations, less normal wear and tear, shall be borne by Tenant.

**24. NON-WAIVER.** Waiver by either party of any term, covenant or condition herein contained any breach thereof shall not be deemed to be a waiver of such term, covenant, or condition or of any subsequent breach of the same or any other term, covenant, or condition herein contained. In addition, the subsequent acceptance of Base Rent or Additional Rent hereunder by Landlord shall not be deemed to be a waiver of any preceding breach by Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay the particular Base Rent or Additional Rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such Base Rent or Additional Rent.

**25. HOLDOVER.** If Tenant shall, with the written consent of Landlord, hold over after the expiration of the term of this Lease, such tenancy shall be deemed a month-to-month tenancy, which may be terminated as provided by applicable state law. During such tenancy, Tenant shall be bound by all of the terms, covenants and conditions herein so far as applicable, except rental which shall be one hundred fifty percent (150%) of the then current Base Rent.

**26. CONDEMNATION.**

    **a. Entire Taking.** If all of the Premises or such portions of the Building as may be required for the reasonable use by Tenant of the Premises, are taken by eminent domain, this Lease shall automatically terminate as of the date title vests in the condemning authority and all Base Rent, Additional Rent and other payments shall be paid to or reimbursed as of that date.

    **b. Constructive Taking of Entire Premises.** In the event of a taking of a material part of but less than all of the Building, where Landlord shall determine that the remaining portions of the Building cannot be economically and effectively used by it (whether on account of physical, economic, aesthetic or other reasons) or where Landlord reasonably determines the Building should be restored in such a way as to materially alter the Premises, Landlord shall forward a written notice to Tenant of such determination not more than sixty (60) days after the date of taking. The term of this Lease shall expire upon such date as Landlord shall specify in such notice but not earlier than sixty (60) days after the date of such notice. In the event of a taking of a material part, but less than all, of the Premises, Tenant shall have the right to terminate this Lease as of the date of such taking.

    **c. Partial Taking.** Subject to the provisions of the preceding Section 26.b, in case of taking of a portion of the Building or the Premises which Tenant does not require for the reasonable operation of its business on the Premises, then this Lease shall continue in full force and effect and the Base Rent and Additional Rent shall be equitably reduced based on the proportion by which the square footage of the Premises is reduced, such Base Rent and Additional Rent reduction to be effective as of the date title to such portion vests in the condemning authority.

    **d. Awards and Damages.** Landlord reserves all rights to damages to the Building for any partial, constructive, or entire taking by eminent domain, and Tenant hereby assigns to Landlord any right Tenant may have to such damages or award, and Tenant shall make no claim against Landlord or the condemning authority for damages for termination of the leasehold interest; provided, however, Tenant shall have the right, however, to claim and recover

from the condemning authority compensation for any loss to which Tenant may be put for Tenant's moving expenses, business interruption, the taking of Tenant's personal property , and Tenant's leasehold interest provided that such damages may be claimed only if they are awarded separately in the eminent domain proceedings.

27. **NOTICES.** All notices under this Lease shall be in writing and delivered in person or sent by registered or certified mail, postage prepaid, to Landlord and to Tenant at the Notice Addresses provided in Section 1.1 (provided that after the Commencement Date, any such notice shall be mailed or delivered by hand to Tenant at the Premises) and to the holder of any Landlord's Mortgage at such place as such holder shall specify to Tenant in writing; or such other addresses as may from time to time be designated by any such party in writing. Notices mailed as aforesaid shall be deemed given three (3) days following the date of such mailing.

28. **COSTS AND ATTORNEYS' FEES.** If Tenant or Landlord shall bring any action for any relief against the other, declaratory or otherwise, arising out of this Lease, including any suit by Landlord for the recovery of Base Rent, Additional Rent or other payments hereunder or possession of the Premises, the losing party shall pay the prevailing party a reasonable sum for attorneys' and paralegal's fees in such suit, at trial and on appeal, and such attorneys' fees shall be deemed to have accrued on the commencement of such action.

29. **LANDLORD'S LIABILITY.** Anything in this Lease to the contrary notwithstanding, covenants, undertakings and agreements herein made on the part of Landlord are made and intended not as personal covenants, undertakings and agreements for the purpose of binding Landlord personally or the assets of Landlord, but are made and intended for the purpose of binding only the Landlord's interest in the Premises and the Building, as the same may from time to time be encumbered. No personal liability or personal responsibility is assumed by, nor shall at any time be asserted or enforceable against any of Landlord's members or their respective heirs, legal representatives, successors or assigns on account of the Lease or on account of any covenant, undertaking or agreement of Landlord in this Lease contained except to the extent of any willful misconduct or negligence by such person or entity.

30. **LANDLORD'S CONSENT.** Except as specified in other provisions of this Lease, whenever Landlord's consent is required under the terms hereof, such consent shall not be unreasonably withheld, conditioned, or delayed, provided, the withholding of Landlord's consent due to any mortgagee's refusal to grant its consent, shall not be deemed unreasonable.

31. **ESTOPPEL CERTIFICATES.** Tenant shall, from time to time, upon written request of Landlord, execute, acknowledge and deliver to Landlord or its designee a written statement, in a commercially reasonable form provided by Landlord's lender, modified as necessary by Tenant to be accurate, stating: the date this Lease was executed and the date it expires; the date the term commenced and the date Tenant accepted the Premises; the amount of monthly Base Rent and the date to which such Base Rent has been paid; and certifying: that this Lease is in full force and effect and has not been assigned, ratified, supplemented or amended in any way (or specifying the date, status, and terms of agreement to the contrary so affecting this Lease); that this Lease represents the entire agreement between the parties as to the leasing of the Premises; that all conditions under this Lease to be performed by the Landlord have been satisfied or remain to be satisfied; the status of all contributions by Landlord to Tenant on account of Tenant Improvements that are to be received; except as may otherwise then exist, that on this date there are no existing claims, defenses or offsets which Tenant has against the enforcement of this Lease by the Landlord; that no Base Rent has been paid more than one

889989.07

month in advance; and that no security has been deposited with Landlord (or, if so, the amount thereof). It is intended that any such statement delivered pursuant to this paragraph may be relied upon by a prospective purchaser of Landlord's interest or assignee of any mortgage upon Landlord's interest in the Building. If Tenant shall fail to respond within ten (10) business days of receipt by Tenant of a written request by Landlord as herein provided, Tenant shall be deemed to have given such certificate as above provided without modification and shall be deemed to have admitted the accuracy of any information supplied by Landlord to a prospective purchaser or mortgagee and to have certified that this Lease is in full force and effect, that there are no uncured defaults in Landlord's performance, that the security deposit is as stated in the Lease, and that not more than one month's Base Rent has been paid in advance.

32. **OPTION TO RENEW.** Landlord grants Tenant the option to extend the Lease term for one additional period of five (5) years (the "Extended Term"), commencing at the end of the initial term of the Lease. The Extended Term shall be upon the same terms and conditions contained in this Lease, except for Base Rent. Tenant shall have no further right to extend the Lease term after the Extended Term. In the event Tenant is not then in default under the terms of the Lease, the option to extend may be exercised by Tenant giving Landlord written notice thereof no less than nine (9) months prior to the end of the initial term of this Lease.

Base Rent for the Extended Term shall be equal to the then fair market rental value ("FMV") for the Premises, but not less than the Base Rent payable on exercise of the option. The FMV shall be established as follows: At least one hundred eighty (180) days prior to the last day of the initial term of this Lease, the parties shall meet to discuss the FMV. The parties shall attempt in good faith to agree on the FMV. In the event the parties are unable to agree on the FMV before a date which is one hundred fifty (150) days prior to the end of the last day of the initial term of this Lease, and confirm such agreement in writing, then:

a. Landlord shall give to Tenant written notice of Landlord's initial determination of the FMV (the "FMV Notice");

b. Landlord's determination of the FMV in the FMV Notice shall be final and binding in fixing the FMV, unless, within fifteen (15) days after Landlord shall have given the FMV Notice to Tenant, Landlord shall receive a written notice from Tenant (the "FMV Objection Notice"): (i) advising Landlord that Tenant disagrees with the initial determination of the FMV set forth in the FMV Notice, and (ii) proposing a specific alternative FMV, which shall have been determined in good faith by Tenant;

c. If Landlord and Tenant shall fail to agree upon a final and binding FMV within fifteen (15) days after Landlord shall have received the FMV Objection Notice, then Landlord and Tenant shall mutually designate an arbitrator whose determination of the FMV (which shall be either the FMV proposed by Landlord in the FMV Notice or the FMV proposed by Tenant in the FMV Objection Notice, but no other amount) shall be final and binding upon Landlord and Tenant;

d. If Landlord and Tenant shall fail to agree upon the choice of such arbitrator within thirty (30) days after Landlord shall have received the FMV Objection Notice,

Tenant may within six (6) business days thereafter withdraw its notice of exercise of the lease extension, and absent the Tenant's withdrawal of its notice of extension, then either party may apply to the American Arbitration Association or any successor thereto having jurisdiction to designate an arbitrator. The arbitrator shall be a real estate broker or consultant who is MAI certified by the Appraisal Institute and who shall have had at least five (5) years' continuous experience in the business of appraising or managing real estate or acting as a real estate agent or broker in Seattle, Washington; and

e.    The arbitrator shall conduct such hearings and investigations as he may deem appropriate and shall, within thirty (30) days after his designation, determine which of the two (2) proposals shall be the FMV, and that choice by the arbitrator shall be binding upon Landlord and Tenant, provided that the arbitrator shall not have the power to add to, modify or change any of the provisions of this Lease. Each party shall pay its own counsel fees and expenses, if any, in connection with any arbitration under this provision, and the parties shall share equally all other expenses and fees of any such arbitration.

In no event shall Base Rent for the Extended Term be less than the Base Rent payable on the date of the exercise of the option, unless otherwise agreed between Landlord and Tenant.

**33.    TRANSFER OF LANDLORD'S INTEREST.**  In the event of any transfer or transfers of Landlord's interest in the Premises or the Building other than a transfer for security purposes only, the transferor shall be automatically relieved of any and all obligations and liabilities on the part of Landlord accruing from and after the date of such transfer, provided the transferee accepts the obligations of Landlord under the Lease, and such transferee shall have no obligation or liability with respect to any matter occurring or arising prior to the date of such transfer for which Landlord will remain liable to Tenant therefor. Except as otherwise provided, Tenant agrees to attorn to the transferee.

**34.    QUIET ENJOYMENT.**  Landlord agrees that upon the timely payment of rents and other charges and upon the due performance by Tenant of all other terms and conditions of this Lease, Tenant shall peacefully and quietly have and enjoy the Premises, free and clear of any claim of ownership superior to that of Landlord; provided Landlord's liability under this Lease shall be only for the period during which it shall be the landlord of the Premises, and provided further, that any reasonable noise from Landlord's construction activities on the Property and on the real property located adjacent to the Property shall not be deemed a violation of this Section. Tenant's right to quiet enjoyment shall extend to protection from interference by any third party, not merely a party claiming by, through or under Landlord.

**35.    RIGHT TO PERFORM.**  If Tenant shall fail to pay any sum of money required to be paid by it hereunder; or shall fail to perform any other act on its part to be performed hereunder, and such failure shall continue for ten (10) days after notice thereof by Landlord, Landlord may, but shall not be obligated so to do, and without waiving or releasing Tenant from any obligations of Tenant, make such payment or perform any such other act on Tenant's part to be made or performed as provided in this Lease. Landlord shall have (in addition to any other right or remedy of Landlord) the same rights and remedies in the event of the nonpayment of sums due under this Section 35 as in the case of default by Tenant in the payment of Base Rent.

## 36. AUTHORITY.

**a. Company Authority.** If Tenant or Landlord is a company, each individual executing this Lease on behalf of Tenant and Landlord respectively represents and warrants that he or she is duly authorized to execute and deliver this Lease on behalf of Tenant and Landlord respectively, in accordance with a duly adopted resolution of the Board of Directors and in accordance with the bylaws (if a corporation) or consent by the member (if a limited liability company), and that this Lease is binding upon said party in accordance with its terms.

**b. Partnership Authority.** If Tenant or Landlord is a partnership, each individual executing this Lease on behalf of Tenant and Landlord respectively represents and warrants that he or she is duly authorized to execute and deliver this Lease on behalf of said party, in accordance with the partnership agreement therefor, and that this Lease is binding upon said party in accordance with its terms.

## 37. TENANT FINANCING.
Provided that Tenant is not in default under this Lease and notwithstanding anything in this Lease to the contrary, Landlord shall waive any and all interest in any Tenant improvement and in Tenant's furniture, furnishings, fixtures and equipment (the "FF&E"), including, without limitation, any statutory lien rights and/or UCC interests unless such improvements were paid for with the Tenant Improvement Allowance. Tenant shall have the right to grant its lender(s) a security interest in any improvements and FF&E paid for by Tenant, and Landlord shall cooperate with Tenant and its lender(s) in executing such financing documents upon which the parties may agree acting in good faith.

## 38. INTENTIONALLY OMITTED.

## 39. FUTURE DEVELOPMENT.
In the event that Landlord further develops the Building and constructs an additional residential tower (the "Future Development") on the northern half of the Building immediately above the Premises after the third anniversary of the Rent Commencement Date, the Base Rent per rentable square foot shall be reduced by fifty percent (50%) commencing on the date construction starts on the Future Development and ending on the date that construction of the Future Development is complete and a temporary certificate of occupancy for the entire Future Development is issued.

## 40. INTENTIONALLY OMITTED.

## 41. GENERAL.

**a. Headings.** Titles to Sections of this Lease are not a part of this Lease and shall have no effect upon the construction or interpretation of any part hereof.

**b. Heirs and Assigns.** All of the covenants, agreements, terms and conditions contained in this Lease shall inure to and be binding upon the Landlord and Tenant and their respective heirs, executors, administrators, successors and assigns.

**c. Brokers.** Landlord and Tenant each represent to the other that it has dealt with no broker in connection with this Lease other than CBRE, Inc. ("Broker"), who represented Landlord and Tenant in this transaction. The Broker's fee shall be paid pursuant to written broker agreements between Broker and Landlord and Broker and Tenant.

- 21 -

**d. Rules and Regulations.** Except to the extent there is any interference with the Permitted Uses, Tenant shall observe such reasonable rules and regulations as Landlord and/or the owner(s) of the Condominium may from time to time make for the operation, reputation, safety, care, security or cleanliness of the Building and Condominium, including the Condominium's parking garage, the operation and maintenance of equipment, the use of common areas of the Condominium, the hours of business, parking areas for vehicles operated by Tenant and its employees, servants, agents and contractors, the lighting of the Premises, and other matters affecting the operation of the Building, Condominium and parking garage, and the establishing and maintaining of a suitable image to the customers of the Building and Condominium.

**e. Entire Agreement.** This Lease contains all covenants and agreements between Landlord and Tenant relating in any manner to the leasing, use and occupancy of the Premises, and to Tenant's use of the Building and other matters set forth in this Lease. No prior agreements or understanding pertaining to the same shall be valid or of any force or effect. The covenants and agreements of this Lease shall not be altered, modified or added to except in writing signed by Landlord and Tenant.

**f. Severability.** Any provision of this Lease which shall prove to be invalid, void or illegal shall in no way affect, impair or invalidate any other provision hereof and the remaining provisions hereof shall nevertheless remain in full force and effect.

**g. Overdue Payments.** Any Base Rent, Additional Rent or other sums payable by Tenant to Landlord under this Lease which shall not be paid upon the due date thereof, shall bear interest at a rate equal to three (3) percentage points above the prime rate of interest stated from time to time by U.S. Bank National Association or its successor, or, in the absence of an established prime rate, three (3) percentage points over that bank's rate for one year certificates of deposit, but not in excess of the highest lawful rate permitted under applicable laws, calculated from the original due date thereof to the date of payment.

**h. Force Majeure.** Except for the payment of Base Rent, Additional Rent or other sums payable by Tenant to Landlord, time periods for Tenant's or Landlord's performance under any provision, of this Lease shall be extended for periods of time during which Tenant's or Landlord's performance is prevented due to circumstances beyond Tenant's or Landlord's control, including without limitation, strikes, embargoes, shortages of labor or materials, governmental regulations, acts of God, war or other strife.

**i. Right to Change Public Spaces.** Landlord shall have the right at any time after the completion of the Building, without thereby creating an actual or constructive eviction or incurring any liability to Tenant therefor, to change the arrangement or location of such of the following as are not contained within the Premises or any part thereof: entrances, passageways, doors and doorways, corridors, stairs, toilets and other like public service portions of the Building; provided, however, in no event may Landlord diminish any service, change the arrangement or location of the elevators serving the Premises, make any change which shall diminish the area of the Premises, or make any change which shall change the character of the Building from that of a first-class retail building, or effect any other change that materially interferes with Tenant's possession or use of the Premises or access thereto by Tenant or any of its invitees, patrons, and otherwise.

889989.07

**j. Compliance With Americans With Disabilities Act.** Landlord shall insure that as of the Commencement Date of this Lease, and except as may be attributable to the act of, or omission, of Tenant and other tenants of the Building, the Building is, or will be, in compliance with all applicable laws, including the Americans With Disabilities Act ("ADA") at Landlord's sole expense.

**k. Hazardous Materials.** Landlord represents and warrants to Tenant that Landlord has not released or deposited on the Premises any hazardous substances, waste, or materials, or any toxic substances and Landlord has no knowledge of the presence of any such substances on the Premises or Building. Landlord agrees to defend, indemnify, and hold harmless Tenant, its employees, agents, and contractors and lenders from and against any and all losses, claims, liabilities, damages, demands, fines, costs, and expenses (including reasonable attorneys' fees) arising out of or resulting from any breach of the foregoing warranty or if there are any hazardous substances, waste, or materials, or any toxic substances on, in, or under the Premises as of the Commencement Date which have been or thereafter become unlawfully released through no fault of Tenant. Such indemnity shall include, without limitation, reasonable attorneys', consultant's and expert's fees, as well as costs incurred in connection with any investigation of site conditions or any clean up, remedial, removal or restoration work required by any federal, state or local governmental agency or political subdivision or other third party.

Tenant covenants and warrants that Tenant, its employees, contractors, agents or invitees, shall not use the Premises in a manner which violates any applicable federal, state or local law, regulation or ordinance governing the handling, transportation, storage, treatment, usage or disposal of hazardous substances, waste, and material or toxic substance in the Building or in the Premises.

Tenant covenants that it will indemnify, defend, and hold harmless Landlord from any claims, judgments, damages, penalties, fines, expenses, liabilities (including sums paid in settlements of claims) or losses arising out of or in any way relating to a breach of the environmental warranty made by Tenant above. Such indemnity shall include, without limitation, reasonable attorneys', consultant's and expert's fees, as well as costs incurred in connection with any investigation of site conditions or any clean-up, remedial, removal or restoration work required by any federal, state or local governmental agency or political subdivision or other third party.

Tenant and Landlord shall immediately notify the other of any and all spills or releases of any toxic or hazardous substances, wastes, or materials or toxic substances, all failures to comply with any federal, state, or local law, regulation or ordinance, all inspection of the Premises by any regulatory entity concerning the same, all regulatory orders or fines, and all response or interim clean-up action taken by or proposed to be taken by any government entity or private party on the Premises.

For the purpose of this Section 41.k, the term, "toxic or hazardous substances, wastes and materials" or "toxic substance" includes any material or substance which is (1) defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Liability and Compensation Act, 42 U.S.C. 9601 (14); (2) defined as a "hazardous waste" pursuant to Section 1004 or Section 3001 of the Resource, Conservation and Recovery Act, 42 U.S.C. 6903, 42 U.S.C. 6921; (3) included on the toxic pollutant list under Section 307(a) of the Federal Water Pollution Control Act, 33 U.S.C. 1317(a); (4) defined as a "hazardous substance" pursuant to Section 311 of the Federal Water Pollution Control Act,

889989.07

33 U.S.C. 1321; (5) defined as a "hazardous air pollutant" under Section 112 of the Clean Air Act, 42 U.S.C. 7412; (6) defined as a "hazardous substance" under Washington's Hazardous Waste Cleanup Act, RCW 70.105B.020; and (7) defined as a "hazardous substance" pursuant to the hazardous waste site clean-up law, the Model Toxics Control Act (Initiative 97). "Toxic or hazardous substances, wastes and materials" specifically includes, but is not limited to, asbestos, polychlorinated biphenyls (PCBs), petroleum and petroleum products, and urea formaldehyde.

The covenants and warranties in this Section 41.k shall survive the termination or expiration of this Lease.

**l. Definition of Business Days.** As used in this Lease, "business days" shall mean Monday through Friday, 8:00 a.m. to 5:00 p.m.

**m. Governing Law.** This Lease shall be governed by and construed in accordance with the laws of the state of Washington.

**n. Building Name.** The Building will be known by such name as Landlord may designate from time to time.

IN WITNESS WHEREOF this Lease has been executed the day and year first above set forth.

*[Signatures follow on next page]*

SIGNATURE PAGE TO LEASE

"LANDLORD"

PIONEER SQUARE DEVELOPMENT LENDER, LLC,
a Washington limited liability company

By:     Stadium Place Investors, LLC, a Washington limited
        liability company, its Manager

   By:     North Lot Development, L.L.C., a Delaware limited
           liability company, its Manager

      By:     North Lot Investors, LLC, a Washington
              limited liability company, its Member

         By:     Daniels Real Estate LLC, a
                 Washington limited liability
                 company, its Manager

                 By _____
                    Kevin Daniels, Manager

      By:     R.D. Merrill Real Estate Holdings LLC, a
              Washington limited liability company, its Member

         By:     R.D. Merrill Company, a Washington
                 corporation, its Manager

                 By _____
                    William D. Pettit III, its Senior Vice
                    President

                 By _____
                    Douglas Spear, its Chief Financial
                    Officer and Senior Vice President

"TENANT"

QUALITY ATHLETICS, LLC,
a Washington limited liability company

By _____
Its         Managing Member

- 25 -

STATE OF WASHINGTON )
                                          ) ss.
COUNTY OF KING                )

I certify that I know or have satisfactory evidence that KEVIN DANIELS is the person who appeared before me, and said person acknowledged that he signed this instrument, on oath stated that he was authorized to execute the instrument and acknowledged it as the Manager of DANIELS REAL ESTATE, LLC, in its capacity as the Manager of NORTH LOT INVESTORS, LLC, in its capacity as a Member of NORTH LOT DEVELOPMENT, L.L.C., in its capacity as the Manager of STADIUM PLACE INVESTORS, LLC, in its capacity as Manager of PIONEER SQUARE DEVELOPMENT LENDER, LLC, to be the free and voluntary act and deed of said limited liability companies, for the uses and purposes mentioned in the instrument.

WITNESS my hand and official seal hereto affixed this 7th day of March, 2014.



(Signature of Notary)

Ashley Lex
(Print or stamp name of Notary)
NOTARY PUBLIC in and for the State
of Washington
My Appointment Expires: 5/30/16

889989.07

STATE OF WASHINGTON )
                         ) ss.

COUNTY OF KING )

       I certify that I know or have satisfactory evidence that William D. Petti☐II is the person who appeared before me, and said person acknowledged that he/she signed this instrument, on oath stated that he/she was authorized to execute the instrument and acknowledged it as the Senior Vice President of R.D. MERRILL COMPANY, in its capacity as the Manager of R.D. MERRILL REAL ESTATE HOLDINGS LLC, in its capacity as a Member of NORTH LOT DEVELOPMENT, L.L.C., in its capacity as the Manager of STADIUM PLACE INVESTORS, LLC, in its capacity as Manager of PIONEER SQUARE DEVELOPMENT LENDER, LLC, to be the free and voluntary act and deed of said entities, for the uses and purposes mentioned in the instrument.

       WITNESS my hand and official seal hereto affixed this __7__ day of March, 2014.

 

(Signature of Notary)

Melissa B. Kocan

(Print or stamp name of Notary)

NOTARY PUBLIC in and for the State of Washington

My Appointment Expires: __10/27/14__

Notary Public
State of Washington
MELISSA B KOCAN
My Appointment Expires Oct 27, 2014

- 27 -

STATE OF WASHINGTON    )
                       ) ss.
COUNTY OF KING         )

I certify that I know or have satisfactory evidence that DOUGLAS D. SPEAR is the person who appeared before me, and said person acknowledged that he signed this instrument, on oath stated that he was authorized to execute the instrument and acknowledged it as the Chief Financial Officer and Senior Vice President of R.D. MERRILL COMPANY, in its capacity as the Manager of R.D. MERRILL REAL ESTATE HOLDINGS LLC, in its capacity as a Member of NORTH LOT DEVELOPMENT, L.L.C., in its capacity as the Manager of STADIUM PLACE INVESTORS, LLC, in its capacity as Manager of PIONEER SQUARE DEVELOPMENT LENDER, LLC, to be the free and voluntary act and deed of said entities, for the uses and purposes mentioned in the instrument.

WITNESS my hand and official seal hereto affixed this ___7___ day of March, 2014.

(Signature of Notary)

_Melissa B. Kocan_

(Print or stamp name of Notary)
NOTARY PUBLIC in and for the State
of Washington
My Appointment Expires: _10/27/14_

Notary Public
State of Washington
MELISSA B KOCAN
My Appointment Expires Oct 27, 2014

- 28 -

STATE OF WASHINGTON    )
                              ) ss.

COUNTY OF KING         )

    I certify that I know or have satisfactory evidence that _Joshua Henderson_ is the person who appeared before me, and said person acknowledged that he signed this instrument, on oath stated that he was authorized to execute the instrument and acknowledged it as the Manager of QUALITY ATHLETICS, LLC, to be the free and voluntary act and deed of said limited liability company, for the uses and purposes mentioned in the instrument.

    WITNESS my hand and official seal hereto affixed this 6ᵗʰ day of March, 2014.



*Hayley Trees*
(Signature of Notary)

*Hayley Trees*
(Print or stamp name of Notary)
NOTARY PUBLIC in and for the State
of Washington
My Appointment Expires: 8·8·16 .

- 29 -

**EXHIBIT A**

**LEGAL DESCRIPTION OF THE BASE UNIT**
**OF WHICH THE PREMISES ARE A PART**

BASE UNIT OF STADIUM PLACE MASTER CONDOMINIUM, A CONDOMINIUM, ACCORDING TO DECLARATION THEREOF RECORDED UNDER RECORDING NO. 20120502000541 AND AMENDMENT(S) THERETO; SAID UNIT IS LOCATED ON SURVEY MAP AND PLANS FILED IN VOLUME 273 OF CONDOMINIUMS, AT PAGES 97 THROUGH 101, IN KING COUNTY, WASHINGTON.

889989.07

# EXHIBIT B
## BUILDING PLAN



RETAIL - SW

LOADING

TRASH

WEST LOBBY

RETAIL - W
Premises

RETAIL - N

PARKING

NORTH LOBBY

SOUTH LOBBY

TRASH

LOADING

PARKING LOBBY

RETAIL - E

STADIUM PLACE - RETAIL
LEVEL 01 - OVERALL
MARCH 12, 2012

- 1 -

889989.07

# EXHIBIT B-1

# FLOOR PLAN





- 1 -

# EXHIBIT C

## MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE (the "Memorandum") is made this _____ day of February, 2014, by and between PIONEER SQUARE DEVELOPMENT LENDER, LLC, a Washington limited liability company ("Landlord"), and QUALITY ATHLETICS, LLC, Washington limited liability company ("Tenant").

IN CONSIDERATION of the rents reserved in that certain Lease Agreement between the parties hereto dated February ____, 2014 (the "Lease"), and of the terms, covenants, conditions and agreements on the part of Landlord and Tenant contained therein, notice is hereby given of the following:

1. <u>Premises Leased</u>. Landlord has leased to Tenant a portion of certain real estate located in Seattle, King County, Washington, and more particularly described on <u>Exhibit A</u> attached hereto and incorporated herein by this reference.

2. <u>Term</u>. The term of the Lease commences on February 17, 2014, and ends fifteen (15) years thereafter, unless terminated earlier as provided in the Lease. Tenant also has the option to extend the Lease term for one period of five (5) years at the end of the initial term.

3. <u>Reference to Lease for Full Particulars</u>. The rentals to be paid by Tenant and all of the obligations and rights of Landlord and Tenant are set forth in the Lease. This Memorandum is merely a memorandum of the Lease and is subject to all of its terms, conditions and provisions. In the event of any inconsistency between the terms of the Lease and this Memorandum, the terms of the Lease shall prevail as between the parties. This Memorandum is binding upon and shall inure to the benefit of the heirs, successors, assigns, executors and administrators of the parties.

4. <u>Counterpart</u>. This Memorandum may be executed in one or more counterparts, and all of the counterparts shall constitute one and the same agreement, notwithstanding that all parties hereto are not signatories to the same or original counterpart.

To indicate their agreement to the above, the parties have signed this Memorandum as of the date first above written.

*[Signature(s) follow on next page(s)]*

889989.07

"LANDLORD"                    PIONEER SQUARE DEVELOPMENT LENDER, LLC,
                              a Washington limited liability company

                    By:      Stadium Place Investors, LLC, a Washington limited
                             liability company, its Manager

                             By:     North Lot Development, L.L.C., a Delaware limited
                                     liability company, its Manager

                                     By:     North Lot Investors, LLC, a Washington
                                             limited liability company, its Member

                                             By:     Daniels   Real    Estate,    LLC,   a
                                                     Washington       limited      liability
                                                     company, its Manager


                                                     By_____
                                                          Kevin Daniels, Manager


                                     By:     R.D. Merrill   Real   Estate   Holdings   LLC,   a
                                             Washington limited liability company, its Member

                                             By:     R.D. Merrill    Company,    a    Washington
                                                     corporation, its Manager


                                                     By_____
                                                     Its_____


                                             By_____
                                                  Douglas Spear, its Chief Financial
                                                  Officer and Senior Vice President


"TENANT"                      QUALITY ATHLETICS, LLC,
                              Washington limited liability company

                              By_____
                              Its_____

- 2 -

STATE OF WASHINGTON          )
                             ) ss.
COUNTY OF KING               )

I certify that I know or have satisfactory evidence that KEVIN DANIELS is the person who appeared before me, and said person acknowledged that he signed this instrument, on oath stated that he was authorized to execute the instrument and acknowledged it as the Manager of DANIELS REAL ESTATE, LLC, in its capacity as the Manager of NORTH LOT INVESTORS, LLC, in its capacity as a Member of NORTH LOT DEVELOPMENT, L.L.C., in its capacity as the Manager of STADIUM PLACE INVESTORS, LLC, in its capacity as Manager of PIONEER SQUARE DEVELOPMENT LENDER, LLC, to be the free and voluntary act and deed of said limited liability companies, for the uses and purposes mentioned in the instrument.

WITNESS my hand and official seal hereto affixed this _____ day of February, 2014.

_____
(Signature of Notary)

_____
(Print or stamp name of Notary)
NOTARY PUBLIC in and for the State
of Washington
My Appointment Expires: _____

- 3 -

STATE OF WASHINGTON    )
                       ) ss.
COUNTY OF KING         )

I certify that I know or have satisfactory evidence that
_____ is the person who appeared before me, and said person
acknowledged that he/she signed this instrument, on oath stated that he/she was authorized to
execute the instrument and acknowledged it as the _____ of R.D. MERRILL
COMPANY, in its capacity as the Manager of R.D. MERRILL REAL ESTATE HOLDINGS
LLC, in its capacity as a Member of NORTH LOT DEVELOPMENT, L.L.C., in its capacity as
the Manager of STADIUM PLACE INVESTORS, LLC, in its capacity as Manager of PIONEER
SQUARE DEVELOPMENT LENDER, LLC, to be the free and voluntary act and deed of said
entities, for the uses and purposes mentioned in the instrument.

WITNESS my hand and official seal hereto affixed this _____ day of February, 2014.

_____
(Signature of Notary)
_____
(Print or stamp name of Notary)
NOTARY PUBLIC in and for the State
of Washington
My Appointment Expires: _____

- 4 -

STATE OF WASHINGTON     )
                        ) ss.
COUNTY OF KING          )

    I certify that I know or have satisfactory evidence that DOUGLAS D. SPEAR is the person who appeared before me, and said person acknowledged that he signed this instrument, on oath stated that he was authorized to execute the instrument and acknowledged it as the Chief Financial Officer and Senior Vice President of R.D. MERRILL COMPANY, in its capacity as the Manager of R.D. MERRILL REAL ESTATE HOLDINGS LLC, in its capacity as a Member of NORTH LOT DEVELOPMENT, L.L.C., in its capacity as the Manager of STADIUM PLACE INVESTORS, LLC, in its capacity as Manager of PIONEER SQUARE DEVELOPMENT LENDER, LLC, to be the free and voluntary act and deed of said entities, for the uses and purposes mentioned in the instrument.

    WITNESS my hand and official seal hereto affixed this _____ day of February, 2014.

_____

(Signature of Notary)

_____

(Print or stamp name of Notary)
NOTARY PUBLIC in and for the State
of Washington
My Appointment Expires: _____

STATE OF WASHINGTON    )
                       ) ss.
COUNTY OF KING         )

I certify that I know or have satisfactory evidence that _Joshua Henderson_ is the persons who appeared before me, and said person acknowledged that he signed this instrument, on oath stated that he was authorized to execute the instrument and acknowledged it as the Manager of QUALITY ATHLETICS, LLC, to be the free and voluntary act and deed of said limited liability company, for the uses and purposes mentioned in the instrument.

WITNESS my hand and official seal hereto affixed this _6th_ day of ~~February~~ _March_, 2014.



_Hayley Trees_
(Signature of Notary)
_Hayley Trees_
(Print or stamp name of Notary)
NOTARY PUBLIC in and for the State
of Washington
My Appointment Expires: _8·8·16_ .

# EXHIBIT A

## Legal Description of the Property of Which the Premises Are a Part

BASE UNIT OF STADIUM PLACE MASTER CONDOMINIUM, A CONDOMINIUM, ACCORDING TO DECLARATION THEREOF RECORDED UNDER RECORDING NO. 20120502000541 AND AMENDMENT(S) THERETO; SAID UNIT IS LOCATED ON SURVEY MAP AND PLANS FILED IN VOLUME 273 OF CONDOMINIUMS, AT PAGES 97 THROUGH 101, IN KING COUNTY, WASHINGTON.

889989.07

# EXHIBIT D
## 2014 ESTIMATED OPERATING COSTS

| CAM Expense Pool # 1 | 2014 budget | Residential | Podium Garage | Retail |
|---|---|---|---|---|
| Wages Routine G & A | $125,899 | $93,669 | $28,978 | $3,252 |
| Wages Routine Maint | $290,110 | $215,842 | $66,775 | $7,493 |
| Wages Other | $0 | $0 | $0 | $0 |
| Wages Other G & A | $0 | $0 | $0 | $0 |
| Wages Other Maint | $0 | $0 | $0 | $0 |
| Wages Accrued | $145 | $108 | $33 | $4 |
| Payroll Taxes | $58,843 | $43,779 | $13,544 | $1,520 |
| Workers Comp Expense | $29,129 | $21,672 | $6,705 | $752 |
| Benefits Insurance | $103,101 | $76,707 | $23,731 | $2,663 |
| Benefits Vacation Exp | $26,082 | $19,405 | $6,003 | $674 |
| Benefits Other | $0 | $0 | $0 | $0 |
| Fire Systems Contract Services | $27,294 | $20,307 | $6,282 | $705 |
| Fire Systems Other Repr & Maint | $1,200 | $893 | $276 | $31 |
| HVAC Contract Services | $10,364 | $7,711 | $2,386 | $268 |
| HVAC Other R & M General | $6,431 | $4,784 | $1,480 | $166 |
| Janitorial Contract Services | $141,933 | $105,598 | $32,669 | $3,666 |
| Janitorial Supplies | $9,646 | $7,176 | $2,220 | $249 |
| Landscape Contract Services | $18,620 | $13,853 | $4,286 | $481 |
| Landscaping or Grounds Other | $2,787 | $2,073 | $641 | $72 |
| Security Contract Services | $126,000 | $93,744 | $29,001 | $3,255 |
| Security Expense Other | $23,549 | $17,520 | $5,420 | $608 |
| Contract Services Other RM | $10,914 | $8,120 | $2,512 | $282 |
| Equipment R & M Minor Purchase | $9,174 | $6,826 | $2,112 | $237 |
| Equipment Rental | $0 | $0 | $0 | $0 |
| Outside Labor R & M | $0 | $0 | $0 | $0 |
| Pest Control | $2,081 | $1,548 | $479 | $54 |
| Window Cleaning | $29,000 | $21,576 | $6,675 | $749 |
| Misc R & M Common Area | $51,230 | $38,115 | $11,792 | $1,323 |
| Misc R & M General | $15,433 | $11,482 | $3,552 | $399 |
| MANAGEMENT FEE | $142,739 | $106,198 | $32,854 | $3,687 |
| Insurance | $148,481 | $110,470 | $34,176 | $3,835 |
| Elevator | | | | |
| Common Area Electricity | $100,471 | $74,750 | $23,125 | $2,595 |
| *Sub Total Expense Pool #1* | *$1,510,655* | *$1,123,928* | *$347,707* | *$39,020* |
| *CAM charges per SF* | *$2.45* | *$2.45* | *$2.45* | *$2.45* |

- 1 -

| CAM Expense Pool #2 | 2014 budget | Residential | Podium Garage | Retail |
|---|---|---|---|---|
| IPM Parking manager - Maintenance | $23,100 | $17,186 | $4,112 | $1,802 |
| *Sub Total Expense Pool #2* | *$23,100* | *$17,186* | *$4,112* | *$1,802* |
| *CAM charges per SF* | | *$0.04* | *$0.04* | *$0.04* |

| CAM Expense Pool #3 | | | Podium Garage | Retail |
|---|---|---|---|---|
| IPM Parking manager - Payroll + G and A | $145,073 | | $100,870 | $44,203 |
| *Sub Total Expense Poll #3* | *$145,073* | *$0* | *$100,870* | *$44,203* |
| *CAM charges per SF* | | | *$0.92* | *$0.92* |

| CAM Expense Pool #4 | | | Podium Garage | Retail |
|---|---|---|---|---|
| Property Tax Podium | $115,270 | | $103,639 | $11,630 |
| *Sub Total Expense Poll #4* | *$115,270* | *$0* | *$103,639* | *$11,630* |
| *CAM charges per SF* | | | *$0.73* | *$0.73* |

| | | | | |
|---|---|---|---|---|
| **Total Common Area Maintenance** | **$1,794,098** | **$1,141,115** | **$556,328** | **$96,655** |
| **CAM charges per SF** | | | | **$6.08** |

1) Expense Pool #1: All expenses pertaining to Residential, Garage and Retail allocated on a per GSF basis.

2) Expense Pool #2: 2014 IPM parking budget for maintenance related activity allocated to Residential, Podium Garage and Retail per GSF. Retail receives a 25% allocation of the GSF of the parking garage.

3) Expense Pool #3: 2014 IPM parking budget for payroll and g and a related activity allocated to the Podium Garage and Retail ONLY on a per GSF basis. Retail receives a 25% allocation of the GSF of the parking garage.

4) Expense Pool #4: 2014 allocated property taxes to podium allocated between retail and podium on a GSF basis

- 2 -

# EXHIBIT E

## TENANT IMPROVEMENTS - STADIUM PLACE

### Description of Landlord's and Tenant's Work

## RESTAURANT

Landlord agrees that it will, at its sole cost and expense, commence the construction of the demised premises and pursue the completion (with the exception of delays or conditions beyond the Landlord's control) in accordance with Landlord's or Landlord's architect's designs and plans, which construction shall include the items generally described as Landlord's Work below and Tenant shall construct, at its sole cost and expense, subject to the Tenant Improvement Allowance, all of the improvements and furnish the Premises to include the items described as Tenant's Work below:

| | |
|---|---|
| **Floor:** | Structural Slab on Grade Concrete Floor with Smooth Finish. |
| **Demising Walls:** | Shall be framed with metal studs, 16" or 24" O.C., and insulated to the underside of structure with drywall installed and fire taped on both sides of the wall – the sheetrock will be left off to allow for Tenant installation of electrical and conduit runs. |
| **Exterior Walls:** | Exterior and perimeter walls will be framed, leaving studs exposed, except that walls will be insulated and fire taped only where required to meet shell occupancy. |
| **Ceiling:** | Landlord shall install an acoustical ceiling in the Premises in a color approved by Tenant. |
| **Columns:** | Interior columns shall be exposed and fire-protected, if required per code. Furring-out of interior columns within the Premises to be provided by Tenant. |
| **Storefront/ Canopies/ Awnings:** | The storefront and glazing is provided in the shell per base building standards. Canopies are existing and may be modified– subject to Landlord & City approval. Proposed modifications to door locations shall be mutually approved by Tenant and Landlord. |
| **Electrical:** | Landlord shall provide and install: <br>• 400 amp 3 phase 277/480 volt panel serving the Premises. Any additional panels shall be a Tenant cost. Tenant shall be responsible for all modifications and for the installation of electrical and conduit runs. <br>• Conduit and J-box for two sign electrical circuits at exterior storefront location on the north and west sides of the Premises. |

- 1 -

**Fire Protection:** Landlord to provide fire sprinkler mains, branch lines and minimum coverage heads installed to meet shell occupancy requirements. Tenant shall be responsible for sprinkler head drops and modifications.

**Fire Alarm:** Landlord provides fire alarm for minimum shell occupancy requirements. Exiting/fire alarm devices per code minimum for shell occupancy requirements. Main alarm panel shall be sized to accommodate the future Tenant's devices without pulling additional building services. Fire extinguisher(s), if required by code, for minimum shell occupancy requirements. Complete penetrations and related patching, firesafing and sealants. Tenant shall use Landlord's required fire alarm contractor and is responsible for any required modifications and connection.

**HVAC:** Landlord shall provide HVAC equipment sized at approximately 1 ton unit per 300 SQFT and ducted to Tenant's demised Premises as specified by Tenant, subject to City Approval. HVAC equipment provided by Landlord shall consist of a split system heat pump with condenser and air handler. Includes equipment, piping, drain lines, ducts, dampers, and controls. Electrical connection, distribution ducting, louvers & grills to be provided by Tenant. Tenant responsible for hooking up heat pumps and connecting condensate drains to restroom drains in TI build out. Any Tenant-provided equipment (or relocated existing equipment) must be located within the designated areas. As to avoid warranty issues, initial start-up of Landlord provided equipment must be coordinated with Landlord's mechanical contractor.

**Telephone:** One 1" empty conduit (w/ pull string) from the facility telecom equipment room to the Premises.

**Cable/Internet:** Tenant will have the opportunity to bring data to the space in their TI build out or sign up for wireless service and will be responsible for such work..

**Restroom(s):** Landlord to provide roughed in restroom(s) to the extent of water and waste lines to a proposed designated location as shown on unit plans. Tenant shall install any restrooms at its sole cost and expense, including exhaust systems and all slab infills. Tenant shall connect heat pump condensate drain lines to restroom waste lines.

**Sewer:** 4" non-grease sanitary waste line to demised space beneath floor slab.

**Water:** One 2"cold water line with remote water meter stubbed into Premises with valve and cap.

**Plumbing Vent:** Roof vent penetration and flushing for exhaust system for Tenant's restrooms and sinks (confirm required size of plumbing vent).

**Roof Penetrations:** All additional roof penetrations required by Tenant's improvements shall be done by Landlord's contractor at Tenant's cost.

**Gas:** Medium pressure 1½ " gas line, complete with valve and pressure regulator, capped off at the Premises.

**Exhaust Pathway:** Scrubber sized per Tenant's specifications shall be provided by Landlord.

**Trash:** Trash and service areas provided with suitable receptacles for wet and dry garbage.

- 2 -

| | |
|---|---|
| **Emergency Egress Lighting:** | Tenant is responsible for providing exterior emergency egress lighting as required by the City of Seattle at all building exits. For exits at glass storefront doors, this lighting can typically be accomplished by positioning interior emergency fixtures such that light from the interior shines through to the exterior. |
| **Utility Connections:** | Water: Billed through Seattle Public Utilities.<br>Gas: Tenant is responsible for making application for service and meter set with Puget Sound Energy as well as final connection from exterior gas line stub to meter.<br>Electric: Tenant is responsible for making application for service and meter set with Seattle City Light.<br>Telephone / Internet/ Cable: Options are CenturyLink, Comcast, Atlas Networks, or Broadstreet. |
| **Required Contractors:** | Convergent Technologies for Fire Alarm.<br>Snyder Roofing for Roof penetrations<br>CPL for Structural.<br>Holiday Parks for Mechanical Unit Start-Up. |

All items listed above, which are not designated as Tenant's responsibility or work to be provided by, installed by or paid for by Tenant, shall be deemed Landlord's Work. All other work, including all casework, finishes, a vestibule, if required by the City of Seattle, and all furniture, fixtures and equipment necessary to operate the Restaurant, shall be deemed Tenant's Work.

# EXHIBIT F
## SCHEDULE OF SUBMISSION OF TENANT'S PLANS



- 1 -



**1** FLOORPLAN

**2** SUSPENDED CEILING DETAILS

889989.07

Case 23-11919-MLB Claim 78 Filed 02/15/24 Desc Main Document Page 63 of 102 Exh. A-59

# Exhibit 2

# FIRST AMENDMENT TO LEASE AGREEMENT

THIS AMENDMENT TO LEASE (the "Amendment") is made and entered into and is effective as of this 25 day of June, 2014, by and between PIONEER SQUARE DEVELOPMENT LENDER, LLC, a Washington limited liability company ("Landlord"), and QUALITY ATHLETICS, LLC, a Washington limited liability company ("Tenant").

## RECITALS:

A.    Landlord is the owner of the Base Unit (the "Building") of the Stadium Place Master Condominium located at 201 King Street, Seattle, King County, Washington 98104.

B.    Landlord and Tenant entered into a Lease Agreement dated March 7, 2014 (the "Lease"), which Lease provides for the lease by Landlord to Tenant of a portion of the Building. Terms defined in the Lease shall have the same meaning when used in this Amendment.

C.    Tenant desires to lease additional space located adjacent to the Premises, and Landlord desires to lease the same to Tenant, in accordance with this Amendment.

NOW, THEREFORE, for and in consideration of the recitals, which are incorporated herein, and other good and valuable consideration, the parties hereto agree that the Lease shall be, and the same hereby is amended as follows:

1.    <u>Lease of Additional Premises</u>. The Premises, as defined in Section 1.b of the Lease, consist of approximately 3,868 rentable square feet on the first floor of the Building (being a portion of Suite Retail W) and, for purposes of this Amendment, are hereby called the "Original Premises". Pursuant to this Amendment, Tenant hereby leases from Landlord approximately 215 rentable square feet of additional space (the "Additional Premises"), as shown on the drawings attached hereto as <u>Exhibit A</u>. The Original Premises and the Additional Premises are hereinafter collectively called the "Premises".

2.    <u>Base Rent</u>. The annual Base Rent amounts set forth in Section 1.f of the Lease are hereby amended as follows:

| Lease Years: | Rent Per Rentable Square Feet for Original Premises: | Rent Per Rentable Square Feet for Additional Premises: | Blended Rent Per Rentable Square Feet for Entire Premises: |
|---|---|---|---|
| Free Rent Period (3/15/2014 - Rent Commencement Date | $0.00 | $0.00 | $0.00 |
| Rent Commencement Date - 01/16/2017 | $30.00 | $25.00 | $29.74 |
| 01/17/2017 - 01/16/2022 | $35.00 | $29.17 | $34.69 |
| 01/17/2022 - 01/16/2026 | $37.50 | $31.25 | $37.17 |
| 01/17/2026 - 01/16/2029 | $40.00 | $33.33 | $39.65 |

3.    <u>Acknowledgment Regarding Additional Premises</u>. The parties acknowledge and agree that the square footage of the Additional Premises shall be included in the total square

935394.01

footage of the Premises for purposes of determining Additional Rent. The parties further acknowledge and agree that there shall be no Tenant Improvement Allowance for the Additional Premises.

4. <u>All Other Terms Remain Unchanged</u>. Except as amended herein, all other terms and conditions of the Lease shall remain unchanged and in full force and effect.

5. <u>Counterparts</u>. This Amendment may be executed in one or more counterparts, and all of the counterparts shall constitute but one and the same agreement, notwithstanding that all parties hereto are not signatories to the same or original counterpart.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the day and year above set forth.

"LANDLORD"    PIONEER SQUARE DEVELOPMENT LENDER, LLC, a Washington limited liability company

By: Stadium Place Investors, LLC, a Washington limited liability company, its Manager

    By: North Lot Development, L.L.C., a Delaware limited liability company, its Manager

        By: North Lot Investors, LLC, a Washington limited liability company, its Member

            By: Daniels Real Estate, LLC, a Washington limited liability company, its Manager

            By: _____
            Kevin Daniels, Manager

        By: R.D. Merrill Real Estate Holdings LLC, a Washington limited liability company, its Member

            By: R.D. Merrill Company, a Washington corporation, its Manager

            By _____
            Its SVP

            By _____
            Its SVP & CFO

935394.01

"TENANT"

QUALITY ATHLETICS, LLC,
a Washington limited liability company

By:    Huxley Wallace Collective, LLC, a Washington limited
liability company, its Manager

By

its Manager

Joshua Henderson,

STATE OF WASHINGTON        )
                           ) ss.
COUNTY OF KING             )

I certify that I know or have satisfactory evidence that KEVIN DANIELS is the person who appeared before me, and said person acknowledged that he signed this instrument, on oath stated that he was authorized to execute the instrument and acknowledged it as the Manager of DANIELS REAL ESTATE, LLC, in its capacity as the Manager of NORTH LOT INVESTORS, LLC, in its capacity as a Member of NORTH LOT DEVELOPMENT, L.L.C., in its capacity as the Manager of STADIUM PLACE INVESTORS, LLC, in its capacity as Manager of PIONEER SQUARE DEVELOPMENT LENDER, LLC, to be the free and voluntary act and deed of said limited liability companies, for the uses and purposes mentioned in the instrument.

WITNESS my hand and official seal hereto affixed this 25th day of _____ June _____, 2014.



_____
(Signature of Notary)

Ashley Lex
_____
(Print or stamp name of Notary)
NOTARY PUBLIC in and for the State
of Washington
My Appointment Expires: 5·30·16 _____

STATE OF WASHINGTON )
) ss.
COUNTY OF KING )

I certify that I know or have satisfactory evidence that
__William D. Pettit III__ is the person who appeared before me, and said person acknowledged that he signed this instrument, on oath stated that he was authorized to execute the instrument and acknowledged it as the __SVP__ of R.D. MERRILL COMPANY, in its capacity as the Manager of R.D. MERRILL REAL ESTATE HOLDINGS LLC, in its capacity as a Member of NORTH LOT DEVELOPMENT, L.L.C., in its capacity as the Manager of STADIUM PLACE INVESTORS, LLC, in its capacity as Manager of PIONEER SQUARE DEVELOPMENT LENDER, LLC, to be the free and voluntary act and deed of said entities, for the uses and purposes mentioned in the instrument.

WITNESS my hand and official seal hereto affixed this __27__ day of
__June__, 2014.

Notary Public
State of Washington
MELISSA B KOCAN
My Appointment Expires Oct 27, 2014

_Mlis B Jocan_
(Signature of Notary)
_Melissa B. Kocan_
(Print or stamp name of Notary)
NOTARY PUBLIC in and for the State
of Washington
My Appointment Expires: __10/27/14__

- 5 -

STATE OF WASHINGTON )
) ss.
COUNTY OF KING )

I certify that I know or have satisfactory evidence that __Douglas D. Spear__ is the person who appeared before me, and said person acknowledged that he signed this instrument, on oath stated that he was authorized to execute the instrument and acknowledged it as the __SVP & CFO__ of R.D. MERRILL COMPANY, in its capacity as the Manager of R.D. MERRILL REAL ESTATE HOLDINGS LLC, in its capacity as a Member of NORTH LOT DEVELOPMENT, L.L.C., in its capacity as the Manager of STADIUM PLACE INVESTORS, LLC, in its capacity as Manager of PIONEER SQUARE DEVELOPMENT LENDER, LLC, to be the free and voluntary act and deed of said entities, for the uses and purposes mentioned in the instrument.

WITNESS my hand and official seal hereto affixed this __27__ day of __June__, 2014.



(Signature of Notary)
__Melissa B. Kocan__
(Print or stamp name of Notary)
NOTARY PUBLIC in and for the State
of Washington
My Appointment Expires: __10/27/14__

Notary Public
State of Washington
MELISSA B KOCAN
My Appointment Expires Oct 27, 2014

- 6 -

STATE OF WASHINGTON )
                     ) ss.
COUNTY OF KING       )

I certify that I know or have satisfactory evidence that JOSHUA HENDERSON is the person who appeared before me, and said person acknowledged that he signed this instrument, on oath stated that he was authorized to execute the instrument and acknowledged it as the Manager of HUXLEY WALLACE COLLECTIVE, LLC, as the Manger of QUALITY ATHLETICS, LLC,, to be the free and voluntary act and deed of said limited liability companies, for the uses and purposes mentioned in the instrument.

WITNESS my hand and official seal hereto affixed this 25th day of
_____ June _____, 2014.



_Ash Ley Lep_
(Signature of Notary)
Ashley Lex
(Print or stamp name of Notary)
NOTARY PUBLIC in and for the State
of Washington
My Appointment Expires: 5·30·16 .

935394.01

## EXHIBIT A



- 8 -



KEG COOLER
7'-0"x10'-0"

WALK-
8'-0"x15'-

OFFICE

STO

7'-10 1/4"

27'-8"

8'-0"

2'-6"

12"
CLR

935394.01

DocuSign Envelope ID: B50E0CE4-D30E-494D-BC29-584AE13EFF65

# SECOND AMENDMENT TO LEASE

THIS SECOND AMENDMENT TO LEASE (the "**Second Amendment**") is made and entered into effective as of [    August    ] [26th], 2020 (the "**Effective Date**"), by and between PIONEER SQUARE DEVELOPMENT LENDER, LLC, a Washington limited liability company ("**Landlord**"), and QUALITY ATHLETICS, LLC, a Washington limited liability company ("**Tenant**"). Capitalized terms not otherwise defined in this Second Amendment shall have the same definitions as set forth in the Lease (as defined below).

## RECITALS

A.      Landlord is the owner of the Base Unit (the "**Building**") of the Stadium Place Master Condominium located at 201 King Street, Seattle, King County, Washington 98104. Pursuant to that certain Lease Agreement dated March 7, 2014, as amended by that certain First Amendment to Lease Agreement dated June 25, 2014 (collectively, the "**Lease**") between Landlord and Tenant, Tenant leases approximately 4,083 rentable square feet (accounting for the additional 215 rentable square feet leased by Tenant under that certain First Amendment to Lease Agreement) located at 121 South King Street, Seattle, King County, Washington 98104 (the "**Premises**") on real property legally described in the Lease. The Building and Premises are more particularly described in the Lease, as amended.

B.      Landlord and Tenant desire to further amend the Lease on the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the above recitals which by this reference are incorporated herein, the mutual covenants and conditions contained herein and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

## AGREEMENT

1.      <u>Rent Deferral</u>**.**  Notwithstanding the provisions of the Lease, as amended, relating to the payment of Rent, including, without limitation, <u>Section 1(f)</u> of the Lease and <u>Section 2</u> of the First Amendment, the Base Rent and Additional Rent payable to Landlord by Tenant during the period from April 1, 2020 to June 30, 2020 is hereby deferred. In conjunction with the deferral of Rent for the foregoing months of the initial Lease term, Rent owed to Landlord for such months shall be paid by Tenant to Landlord beginning June 1, 2021 and amortized over the successive twenty-four (24) month period as more particularly described in **Exhibit A** attached hereto and in addition to any Rent owed under the Lease, as amended.

2.      <u>Rent Relief</u>.  Notwithstanding the provisions of the Lease, as amended, relating to the payment of Rent, including, without limitation, <u>Section 1(f)</u> of the Lease and <u>Section 2</u> of the First Amendment, the Base Rent and Additional Rent payable to Landlord by Tenant is amended as follows:

2.1      For the period of July 1, 2020 through June 30, 2021, Rent due to Landlord by Tenant shall be Six Thousand Dollars ($6,000.00) per month plus eight percent (8%) of Tenant's

Gross Sales (defined hereafter) over and above one-hundred thousand dollars $100,000.00 for any single month during this period ("**Percentage Rent**"). For example, if Tenant's Gross Sales for the month of May, 2021 are One Hundred and Twenty Thousand Dollars ($120,000.00), Tenant shall pay to Landlord eight percent (8%) of Twenty Thousand Dollars ($20,000.00) as Percentage Rent in accordance with this subsection and in addition to the Six Thousand Dollar ($6,000.00) monthly payment. "**Gross Sales**" shall mean the dollar aggregate of the actual sale prices, whether for cash, credit, or otherwise, of all sales of food, beverages, catering, goods and services and all other income and receipts whatsoever of all business conducted at, on, or from the Premises, whether made for cash, on credit, or otherwise, including, without limitation: (i) mail, telephone, computer, facsimile and other orders received or filled at the Premises; (ii) orders taken at the Premises though filled elsewhere; (iii) gross receipts from vending and game machines; (iv) sale price of gift and merchandise certificates when redeemed; (v) payments from other parties for advertising or display space at or respecting the Premises; (vi) all other gross income or receipts from any business or operation at, in or from the Premises; and (vii) Gross Sales by any sublessee, concessionaire, or licensee. However, Gross Sales shall not include (but Tenant shall keep separate records therefor as part of Tenant's records): (a) returns to shippers, distributors, or manufacturers; (b) any cash or credit refunds made upon any sale in or from the Premises where the merchandise is returned by the purchaser (to the extent such items were previously included in Gross Sales); (c) any sales or excise tax imposed by any duly constituted governmental authority (provided that no income or franchise tax, capital stock tax, tax based upon gross receipts, assets or net worth, or similar tax shall be deducted from Gross Sales); (d) parcel post or other pass on delivery charges; (e) employee discounts up to one percent (1%) of Gross Sales during any calendar year; (f) credit for prompt payments of state sales taxes; (g) fees, discounts, and charges paid by Tenant with respect to check guarantees or to the issuers of credit cards on account of the use of credit cards by Tenant's customer, cash shortages and overages shall be netted; and (h) payment of tips or gratuities to wait staff. No deduction shall be allowed for any uncollected or uncollectible amounts or reserves therefor, nor for the cost of products or services sold, or other costs, charges or expenses of purchasing, financing, selling, transportation, overhead, or taxes except as expressly provided herein. Tenant shall submit to Landlord, along with the monthly payments of Rent (including any monthly payments of Percentage Rent) in accordance with this Second Amendment, monthly statements of Tenant's Gross Sales ("**Gross Sales Statements**") within three (3) days following the end of each month during the above-described period.

    **2.2**    For the period of July 1, 2021 through June 30, 2022, Rent due to Landlord by Tenant shall be Ten Thousand Dollars ($10,000.00) per month.

    **3.**    <u>Return to Regular Payment Structure</u>. Commencing July 1, 2022, Tenant shall resume paying Rent due to Landlord under the Lease in accordance with <u>Section 1(f)</u> of the Lease, <u>Section 2</u> of the First Amendment, this Second Amendment and all other relevant terms therein.

    **4.**    <u>Future Development</u>. <u>Section 39</u> of the Lease is hereby deleted in its entirety and replaced with the following language:

    "In the event that Landlord further develops the Building and constructs an additional residential tower (the "Future Development") on the northern half of the Building immediately above the Premises after the third anniversary of the Rent Commencement Date and such construction exceeds twenty-four months from the commencement of

construction (as solely determined by Landlord), the Base Rent per rentable square foot shall be reduced by fifty percent (50%) for any month exceeding the twenty-four month construction period and shall conclude upon the issuance of a temporary certificate of occupancy. Upon the issuance of a temporary certificate of occupancy for the Future Development, reduced Base Rent shall return to the amounts described in the Lease, as amended, the following month."

In the event Tenant receives reduced Base Rent under the provision above, such a reduction in Base Rent shall not modify, in any way, Tenant's obligation to repay the deferred rent due to Landlord and as more particularly described in **Exhibit A** attached hereto.

5.      <u>Lease Remains in Effect</u>.  Except as provided in this Second Amendment, all of the terms, covenants and conditions of the Lease are in full force and effect and the Lease is hereby ratified and confirmed.  To the extent of a conflict between the Lease and this Second Amendment, the provisions of this Second Amendment shall prevail.  This Second Amendment contains all of the agreements of the parties with respect to the matters set forth herein.

6.      <u>Tenant Affirmation</u>.  Tenant acknowledges and affirms to Landlord that as of the date of this Second Amendment, (i) Landlord is not in default under the Lease, (ii) Tenant has no offsets, claims or defenses against Landlord with respect to any obligation or duty of Landlord arising pursuant to the Lease, as amended herein; and (iii) there are no existing circumstances which with the passage of time, or notice, or both, would give rise to a default under the Lease

7.      <u>Counterparts and Electronic Signatures</u>.  This Second Amendment may be executed in one or more counterparts, and all of the counterparts shall constitute one and the same agreement, notwithstanding that all parties hereto are not signatories to the same or original counterpart.  Landlord and Tenant agree that this transaction may be conducted by electronic means pursuant to the provisions of the Uniform Electronic Transaction Act.

*[Rest of page intentionally left blank; signature page follows]*

DocuSign Envelope ID: B50E0CE4-D30E-494D-BC29-584AE13EFF65

IN WITNESS WHEREOF, the parties have executed this Second Amendment as of the day and year above set forth.

**"LANDLORD"**      PIONEER SQUARE DEVELOPMENT LENDER, LLC,
a Washington limited liability company

By:     R.D. Merrill Real Estate Holdings LLC, a Washington limited liability company, its Member

        By:     R.D. Merrill Company, a Washington corporation, its Manager

           By: _____  8/27/2020
           Name: William D Pettit III
           Its: President

**"TENANT"**       QUALITY ATHLETICS, LLC,
a Washington limited liability company

By:     Huxley Wallace Collective, LLC,
a Washington limited liability company
Its:     Manager

       By: _____
         Joshua Henderson, Manager

DocuSign Envelope ID: B50E0CE4-D30E-494D-BC29-584AE13EFF65

## EXHIBIT A

## REPAYMENT SCHEDULE FOR DEFERRED RENT

|        | Base Rent | Additional Rent |
|--------|-----------|-----------------|
| Jan-21 | $1,475.41 | $462.53 |
| Feb-21 | $1,475.41 | $462.53 |
| Mar-21 | $1,475.41 | $462.53 |
| Apr-21 | $1,475.41 | $462.53 |
| May-21 | $1,475.41 | $462.53 |
| Jun-21 | $1,475.41 | $462.53 |
| Jul-21 | $1,475.41 | $462.53 |
| Aug-21 | $1,475.41 | $462.53 |
| Sep-21 | $1,475.41 | $462.53 |
| Oct-21 | $1,475.41 | $462.53 |
| Nov-21 | $1,475.41 | $462.53 |
| Dec-21 | $1,475.41 | $462.53 |
| Jan-22 | $1,475.41 | $462.53 |
| Feb-22 | $1,475.41 | $462.53 |
| Mar-22 | $1,475.41 | $462.53 |
| Apr-22 | $1,475.41 | $462.53 |
| May-22 | $1,475.41 | $462.53 |
| Jun-22 | $1,475.41 | $462.53 |
| Jul-22 | $1,475.41 | $462.53 |
| Aug-22 | $1,475.41 | $462.53 |
| Sep-22 | $1,475.41 | $462.53 |
| Oct-22 | $1,475.41 | $462.53 |
| Nov-22 | $1,475.41 | $462.53 |
| Dec-22 | $1,475.41 | $462.53 |
| **Total** | **$35,409.81** | **$11,100.63** |

SECOND AMENDMENT TO LEASE – QUALITY ATHLETICS – 5
15275982 [14232-7]

# THIRD AMENDMENT TO LEASE

THIS THIRD AMENDMENT TO LEASE (the "**Third Amendment**") is made and entered into effective as of June 30, 2022 (the "**Effective Date**"), by and between PIONEER SQUARE DEVELOPMENT LENDER, LLC, a Washington limited liability company ("**Landlord**"), and QUALITY ATHLETICS, LLC, a Washington limited liability company ("**Tenant**"). Capitalized terms not otherwise defined in this Second Amendment shall have the same definitions as set forth in the Lease (as defined below).

## RECITALS

A.     Landlord is the owner of the Base Unit (the "**Building**") of the Stadium Place Master Condominium located at 201 King Street, Seattle, King County, Washington 98104. Pursuant to that certain Lease Agreement dated March 7, 2014, as amended by that certain First Amendment to Lease Agreement dated June 25, 2014, and the Second Amendment to Lease dated August 26, 2020 (collectively, the "**Lease**") between Landlord and Tenant, Tenant leases approximately 4,083 rentable square feet (accounting for the additional 215 rentable square feet leased by Tenant under that certain First Amendment to Lease Agreement) located at 121 South King Street, Seattle, King County, Washington 98104 (the "**Premises**") on real property legally described in the Lease. The Building and Premises are more particularly described in the Lease, as amended.

B.     Landlord and Tenant desire to further amend the Lease on the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the above recitals which by this reference are incorporated herein, the mutual covenants and conditions contained herein and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

## AGREEMENT

1.     <u>Deferred Rent – Promissory Note</u>. The Base Rent and Additional Rent that has been deferred and/or otherwise due under the Lease pursuant to paragraph 1 of the First Amendment and other items of Rent that Tenant has failed to pay through September 15, 2022 are being reduced to payment pursuant to a promissory note in the total principal amount of Two Hundred Five Thousand Eight Hundred Ninety Five Thousand and 00/100th Dollars ($205,895.00) together with interest thereon (the "**Promissory Note**"), a copy of which is attached hereto and incorporated herein as <u>Exhibit A</u>. Any default in payment of amounts due under the Promissory Note shall constitute a default under this Lease.

2.     <u>Rent Relief</u>. Notwithstanding the provisions of the Lease, as amended, relating to the payment of Rent, including, without limitation, <u>Section 1(f)</u> of the Lease and <u>Section 2</u> of the First Amendment and Second Amendment, the Base Rent and Additional Rent payable to Landlord by Tenant is amended and restated as follows:

2.1     For the period of July 1, 2022 through June 30, 2024, Rent due to Landlord by Tenant shall be Five Thousand Dollars ($5,000.00) per month plus eight percent (8%) of Tenant's Gross Sales (defined hereafter) over and above two-hundred thousand dollars ($200,000.00) for any calendar quarter beginning October 1, 2022 during this period ("**Percentage Rent**").  For example, if Tenant's Gross Sales for the fourth (4th) quarter of 2022 are Two Hundred and Twenty Thousand Dollars ($220,00.00), Tenant shall pay to Landlord eight percent (8%) of Twenty Thousand Dollars ($20,000.00) as Quarterly Percentage Rent for such quarter in accordance with this subsection in addition to the Five Thousand Dollar ($5,000.00) monthly payments. Quarterly Percentage Rent shall be paid within fifteen (15) days of the end of a calendar quarter. "**Gross Sales**" shall mean shall mean the dollar aggregate of the actual sale prices, whether for cash, credit, or otherwise, of all sales of food, beverages, catering, goods and services and all other income and receipts whatsoever of all business conducted at, on, or from the Premises, whether made for cash, on credit, or otherwise, during a calendar quarter, including, without limitation: (i) mail, telephone, computer, facsimile and other orders received or filled at the Premises; (ii) orders taken at the Premises though filled elsewhere; (iii) gross receipts from vending and game machines; (iv) sale price of gift and merchandise certificates when redeemed; (v) payments from other parties for advertising or display space at or respecting the Premises; (vi) all other gross income or receipts from any business or operation at, in or from the Premises; and (vii) Gross Sales by any sublessee, concessionaire, or licensee.  However, Gross Sales shall not include (but Tenant shall keep separate records therefor as part of Tenant's records): (a) returns to shippers, distributors, or manufacturers; (b) any cash or credit refunds made upon any sale in or from the Premises where the merchandise is returned by the purchaser (to the extent such items were previously included in Gross Sales); (c) any sales or excise tax imposed by any duly constituted governmental authority (provided that no income or franchise tax, capital stock tax, tax based upon gross receipts, assets or net worth, or similar tax shall be deducted from Gross Sales); (d) parcel post or other pass on delivery charges; (e) employee discounts up to one percent (1%) of Gross Sales during any calendar year; (f) credit for prompt payments of state sales taxes; (g) fees, discounts, and charges paid by Tenant with respect to check guarantees or to the issuers of credit cards on account of the use of credit cards by Tenant's customer, cash shortages and overages shall be netted; and (h) payment of tips or gratuities to wait staff.  No deduction shall be allowed for any uncollected or uncollectible amounts or reserves therefor, nor for the cost of products or services sold, or other costs, charges or expenses of purchasing, financing, selling, transportation, overhead, or taxes except as expressly provided herein.  Tenant shall submit to Landlord, in addition to the monthly payments of Rent (including any quarterly payments of Percentage Rent) in accordance with this Third Amendment, monthly statements of Tenant's Gross Sales ("**Gross Sales Statements**") within three (3) days following the end of each month during the above-described period.

3.     <u>Return to Regular Payment Structure</u>.  Commencing July 1, 2024, Tenant shall resume paying Rent due to Landlord under the Lease in accordance with <u>Section 1(f)</u> of the Lease, <u>Section 2</u> of the First Amendment, this Second Amendment and all other relevant terms therein.

4.     <u>Landlord's Right to Cancel Lease</u>.

4.1     Landlord shall have the right to cancel this Lease (regardless of whether Tenant is in default under the Lease or the Promissory Note or not) with nine (9) months prior written notice to Tenant (the "**Notice**") in the event that Landlord has found a replacement tenant for the Premises as evidenced by a Triggering LOI (defined below). In addition, Landlord shall have the right to

cancel this Lease at any time that Tenant shall be in default of the Lease or the Promissory Note beyond any period of cure allowed. Notwithstanding the foregoing statement, nothing herein shall be construed to limit or otherwise replace the remedies available to Landlord under the Lease, but shall be construed in a manner that amplifies the rights and remedies available to Landlord under the Lease. Evidence of Landlord's having found a replacement tenant shall be evidenced by a written letter of intent that Landlord is prepared to accept from a third party (the "**Triggering LOI**").

4.2    Tenant shall have the right to cancel Landlord's Notice of cancellation upon the following conditions:

**4.2.1**   Tenant shall not be in default under the Lease or the Promissory Note at the time Landlord delivers the Notice and Triggering LOI to Tenant or at any time prior thereto even if such default was cured;

**4.2.2**   The Promissory Note is paid in full pursuant to its terms, or if not yet paid in full, shall be paid in full by Tenant within thirty (30) days of Landlord's delivery of the Notice and Triggering LOI to Tenant;

**4.2.3**   A Lease Amendment is entered into between Landlord and Tenant upon substantially the same terms as the terms provided under the Triggering LOI no later than thirty (30) days following Landlord's delivery of the Notice and Triggering LOI to Tenant; and

**4.2.4**   Tenant shall deliver to Landlord within ten (10) days of receipt of the Notice and Triggering LOI written notice of Tenant's intent to cancel Landlord's Notice of cancellation.

5.    <u>Lease Remains in Effect</u>.  Except as provided in this Second Amendment, all of the terms, covenants and conditions of the Lease are in full force and effect and the Lease is hereby ratified and confirmed.  To the extent of a conflict between the Lease and this Second Amendment, the provisions of this Second Amendment shall prevail.  This Second Amendment contains all of the agreements of the parties with respect to the matters set forth herein.

6.    <u>Tenant Affirmation</u>.  Tenant acknowledges and affirms to Landlord that as of the date of this Second Amendment, (i) Landlord is not in default under the Lease, (ii) Tenant has no offsets, claims or defenses against Landlord with respect to any obligation or duty of Landlord arising pursuant to the Lease, as amended herein; and (iii) there are no existing circumstances which with the passage of time, or notice, or both, would give rise to a default by Landlord under the Lease.

7.    <u>Counterparts and Electronic Signatures</u>.  This Second Amendment may be executed in one or more counterparts, and all of the counterparts shall constitute one and the same agreement, notwithstanding that all parties hereto are not signatories to the same or original counterpart.  Landlord and Tenant agree that this transaction may be conducted by electronic means pursuant to the provisions of the Uniform Electronic Transaction Act.

*[Rest of page intentionally left blank; signature page follows]*

IN WITNESS WHEREOF, the parties have executed this Second Amendment as of the day and year above set forth.

**"LANDLORD"**    PIONEER SQUARE DEVELOPMENT LENDER, LLC,
a Washington limited liability company

By:    R.D. Merrill Real Estate Holdings LLC, a Washington limited
liability company, its Member

By:    R.D. Merrill Company, a Washington corporation, its
Manager

By: _____
Name: _Douglas D. Spear_____
Its: _EVP-CFO_____

**"TENANT"**    QUALITY ATHLETICS, LLC,
a Washington limited liability company

By:    Huxley Wallace Collective, LLC,
a Washington limited liability company
Its:    Manager

By: _____
Joshua Henderson, Manager

**EXHIBIT A**

**Promissory Note**

**PROMISSORY NOTE**
**(Quality Athletics)**

Borrower:                Quality Athletics, LLC
                         a Washington limited liability company
                         4511 Shilshole Avenue Northwest
                         Seattle, WA 98107
                         Attention:  Josh Henderson

Lender:                  Pioneer Square Development Lender, LLC
                         2401 Utah Avenue South, Suite 305
                         Seattle, WA  98134
                         Attention:  Douglas Spear

Date of Making:          October 5, 2022

Principal Amount:        $205,895.00

Principal Payment        60 months
Amortization Period

Interest Rate:           5.0% per annum, without compounding

Guarantor:               Joshua Henderson

     **1.**    **Terms.** For valuable consideration received, Borrower hereby promises to pay to the order of Lender the principal sum of $205,895.00 with interest thereon at the rate set forth above, which principal and interest will be due and payable in full without demand on the earlier of (a) the fifth (5th) anniversary of the Date of Making, or (b) any earlier date on which the unpaid principal balance of this Note becomes due and payable, by acceleration or otherwise (the "**Maturity Date**").

     **2.**    **Payments/Late Fee.** Borrower shall make equal monthly payments of Three Thousand Eight Hundred Eighty-Five and 49/100 Dollars ($3,885.49) on or before the 1st day of each month, commencing on November 1, 2022, which sum fully amortizes the Loan over the Principal Payment Amortization Period, as set forth on Exhibit A attached hereto and incorporated herein by this reference. Borrower shall make all payments by electronic funds transfer to Lender's account as provided by Lender.  In the event a payment is more than five (5) days late, including without limitation payment at Maturity, Borrower shall pay a late fee of five percent (5%) of the amount due. All payments made under this Note shall be applied first to the costs and expenses of the Lender, then to accrued but unpaid interest, and then to principal.

3. **Default.** Borrower shall be in default hereunder in the event Borrower (i) fails to make any payment when due hereunder and such failure is not cured within five (5) days, or (ii) fails to perform any other obligation, term or condition required under this Note or that certain Lease Agreement dated March 7, 2014 (as amended, the "**Lease**"). Upon an event of default, the whole sum of principal, interest and all other sums due from Borrower hereunder will become immediately due and payable at the sole option of the Lender upon written notice to Borrower. All outstanding amounts under this Note will bear interest during any period in which the Borrower is in default at a rate of ten percent (10%) per annum, or, if such increased rate of interest may not be collected from the Borrower under applicable law, then at the maximum increased rate of interest, if any, which may be collected from the Borrower under applicable law.

4. **Waiver.** Borrower hereby waives presentment for payment, protest, dishonor, nonpayment, default, and notice of any and all of the foregoing.

5. **Prepayment.** Borrower may prepay this Note in whole, without penalty, and without Lender's prior written permission, at any time.

6. **Security.** This Note is unsecured.

7. **Attorneys' Fees and Costs.** In the event of any default under this Note, Borrower agrees to pay all costs incurred by Lender in collecting the sums due hereunder, including, without limitation, Lender's attorneys' fees and legal expenses, whether or not there is a lawsuit.

8. **Remedies.** Upon the occurrence and continuation of an event of default, Lender will have, in addition to all rights and remedies available to Lender at law or in equity, all rights and remedies specified in the Lease.

9. **Notices.** Any notices required or permitted to be made hereunder shall be made in the same manner as set forth in the Lease.

10. **Forbearance.** Any forbearance of Lender in exercising any right or remedy hereunder or under the Lease, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any right or remedy. The acceptance by Lender of payment of any sum payable hereunder after the due date of such payment shall not be a waiver of Lender's right to either require prompt payment when due of all other sums payable hereunder or to declare a default for failure to make prompt payment. No delay or omission on the part of Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note.

11. **Invalidity of any Provisions of this Note.** If, for any reason, any of the terms or provisions of this Note are found to be invalid, illegal, unenforceable or contrary to any applicable law, such invalidity, illegality or unenforceability shall not affect any other provision of this Note, but this Note shall be construed as if such invalid, illegal or unenforceable provision had never been contained in this Note, and the Borrower hereby agrees that this Note shall still remain in full force and effect subject only to the exclusion of those terms or provisions that have been found invalid, illegal, unenforceable or contrary to any such applicable law.

12. **Guaranty.** By Guarantor's signature hereunder, Guarantor absolutely and unconditionally guarantees to Lender, its successors and assigns, the timely payment and

performance of all of Tenant's obligations under this Note and any extensions, renewals, or modifications thereof. If Borrower shall default in the payment of any amounts due under this Note, then Guarantor, at Guarantor's expense, shall upon written demand by Lender pay to Lender all sums due to Lender under this Note, including without limitation, all interest, costs advanced by Lender, damages, and all expenses (including, without limitation, reasonable attorneys' fees and costs) that may arise in consequence of Borrower's default. This guaranty is a limited guaranty of payment and performance and not of collection. Guarantor represents to Lender that it expects to derive financial or other benefits from Borrower and that this guaranty is supported by adequate consideration.

13. **Governing Law.** This Note will be governed by Washington law.

14. **Time.** Time is of the essence in the performance of all matters set forth herein.

ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.

*[Signature Page Follows]*

DATED effective as of the Date of Making set forth above.

**BORROWER:**

QUALITY ATHLETICS, LLC,
a Washington limited liability company

By:    Huxley Wallace Collective, LLC,
       a Washington limited liability company
Its:   Manager

      By: _____
          Joshua Henderson, Manager

**GUARANTOR:**

_____
Joshua Henderson

Exhibit A

| | | | | | |
|---|---|---|---|---|---|
| Loan Amount | $205,895 | | | | |
| Interest | 5% | | | | |
| Term | 60 months | | | | |

| Period | Date | Interest | Principal | Payment | Balance |
|---|---|---|---|---|---|
| 0 | | | | | $205,895 |
| 1 | 11/1/2022 | $857.89 | $3,027.59 | $3,885.49 | $202,867 |
| 2 | 12/1/2022 | $845.28 | $3,040.21 | $3,885.49 | $199,827 |
| 3 | 1/1/2023 | $832.61 | $3,052.87 | $3,885.49 | $196,774 |
| 4 | 2/1/2023 | $819.89 | $3,065.60 | $3,885.49 | $193,708 |
| 5 | 3/1/2023 | $807.12 | $3,078.37 | $3,885.49 | $190,630 |
| 6 | 4/1/2023 | $794.29 | $3,091.19 | $3,885.49 | $187,539 |
| 7 | 5/1/2023 | $781.41 | $3,104.07 | $3,885.49 | $184,435 |
| 8 | 6/1/2023 | $768.48 | $3,117.01 | $3,885.49 | $181,318 |
| 9 | 7/1/2023 | $755.49 | $3,130.00 | $3,885.49 | $178,188 |
| 10 | 8/1/2023 | $742.45 | $3,143.04 | $3,885.49 | $175,045 |
| 11 | 9/1/2023 | $729.35 | $3,156.13 | $3,885.49 | $171,889 |
| 12 | 10/1/2023 | $716.20 | $3,169.28 | $3,885.49 | $168,719 |
| 13 | 11/1/2023 | $703.00 | $3,182.49 | $3,885.49 | $165,537 |
| 14 | 12/1/2023 | $689.74 | $3,195.75 | $3,885.49 | $162,341 |
| 15 | 1/1/2024 | $676.42 | $3,209.07 | $3,885.49 | $159,132 |
| 16 | 2/1/2024 | $663.05 | $3,222.44 | $3,885.49 | $155,910 |
| 17 | 3/1/2024 | $649.62 | $3,235.86 | $3,885.49 | $152,674 |
| 18 | 4/1/2024 | $636.14 | $3,249.35 | $3,885.49 | $149,424 |
| 19 | 5/1/2024 | $622.60 | $3,262.89 | $3,885.49 | $146,161 |
| 20 | 6/1/2024 | $609.01 | $3,276.48 | $3,885.49 | $142,885 |
| 21 | 7/1/2024 | $595.35 | $3,290.13 | $3,885.49 | $139,595 |
| 22 | 8/1/2024 | $581.65 | $3,303.84 | $3,885.49 | $136,291 |
| 23 | 9/1/2024 | $567.88 | $3,317.61 | $3,885.49 | $132,973 |
| 24 | 10/1/2024 | $554.06 | $3,331.43 | $3,885.49 | $129,642 |
| 25 | 11/1/2024 | $540.17 | $3,345.31 | $3,885.49 | $126,297 |
| 26 | 12/1/2024 | $526.24 | $3,359.25 | $3,885.49 | $122,937 |
| 27 | 1/1/2025 | $512.24 | $3,373.25 | $3,885.49 | $119,564 |
| 28 | 2/1/2025 | $498.18 | $3,387.30 | $3,885.49 | $116,177 |
| 29 | 3/1/2025 | $484.07 | $3,401.42 | $3,885.49 | $112,775 |
| 30 | 4/1/2025 | $469.90 | $3,415.59 | $3,885.49 | $109,360 |
| 31 | 5/1/2025 | $455.67 | $3,429.82 | $3,885.49 | $105,930 |
| 32 | 6/1/2025 | $441.38 | $3,444.11 | $3,885.49 | $102,486 |
| 33 | 7/1/2025 | $427.02 | $3,458.46 | $3,885.49 | $99,027 |
| 34 | 8/1/2025 | $412.61 | $3,472.87 | $3,885.49 | $95,555 |
| 35 | 9/1/2025 | $398.14 | $3,487.34 | $3,885.49 | $92,067 |
| 36 | 10/1/2025 | $383.61 | $3,501.87 | $3,885.49 | $88,565 |
| 37 | 11/1/2025 | $369.02 | $3,516.46 | $3,885.49 | $85,049 |
| 38 | 12/1/2025 | $354.37 | $3,531.12 | $3,885.49 | $81,518 |
| 39 | 1/1/2026 | $339.66 | $3,545.83 | $3,885.49 | $77,972 |
| 40 | 2/1/2026 | $324.88 | $3,560.60 | $3,885.49 | $74,411 |
| 41 | 3/1/2026 | $310.05 | $3,575.44 | $3,885.49 | $70,836 |
| 42 | 4/1/2026 | $295.15 | $3,590.34 | $3,885.49 | $67,246 |
| 43 | 5/1/2026 | $280.19 | $3,605.30 | $3,885.49 | $63,640 |
| 44 | 6/1/2026 | $265.17 | $3,620.32 | $3,885.49 | $60,020 |
| 45 | 7/1/2026 | $250.08 | $3,635.40 | $3,885.49 | $56,385 |
| 46 | 8/1/2026 | $234.94 | $3,650.55 | $3,885.49 | $52,734 |
| 47 | 9/1/2026 | $219.73 | $3,665.76 | $3,885.49 | $49,068 |
| 48 | 10/1/2026 | $204.45 | $3,681.04 | $3,885.49 | $45,387 |
| 49 | 11/1/2026 | $189.11 | $3,696.37 | $3,885.49 | $41,691 |
| 50 | 12/1/2026 | $173.71 | $3,711.77 | $3,885.49 | $37,979 |
| 51 | 1/1/2027 | $158.25 | $3,727.24 | $3,885.49 | $34,252 |
| 52 | 2/1/2027 | $142.72 | $3,742.77 | $3,885.49 | $30,509 |
| 53 | 3/1/2027 | $127.12 | $3,758.37 | $3,885.49 | $26,751 |
| 54 | 4/1/2027 | $111.46 | $3,774.03 | $3,885.49 | $22,977 |
| 55 | 5/1/2027 | $95.74 | $3,789.75 | $3,885.49 | $19,187 |
| 56 | 6/1/2027 | $79.95 | $3,805.54 | $3,885.49 | $15,381 |
| 57 | 7/1/2027 | $64.09 | $3,821.40 | $3,885.49 | $11,560 |
| 58 | 8/1/2027 | $48.17 | $3,837.32 | $3,885.49 | $7,723 |
| 59 | 9/1/2027 | $32.18 | $3,853.31 | $3,885.49 | $3,869 |
| 60 | 10/1/2027 | $16.12 | $3,869.36 | $3,885.49 | ($0) |

# Exhibit 3

## ASSIGNMENT AND ASSUMPTION OF LEASE

THIS ASSIGNMENT AND ASSUMPTION OF LEASE (this "Assignment") is made and entered into as of this 16th day of December, 2022 ("Effective Date"), by and among QUALITY ATHLETICS, LLC, a Washington limited liability company ("Assignor"), HWC BURBS BURGERS LLC, a Washington limited liability company ("Assignee"), and PIONEER SQUARE DEVELOPMENT LENDER, LLC, a Washington limited liability company ("Landlord"). Assignor, Assignee and Landlord may be referred to individually hereinafter as a "Party" or collectively as the "Parties" as appropriate under the circumstances. Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Lease (as hereinafter defined).

### RECITALS

A.      Assignor, as tenant, and Landlord, are parties to that certain Lease Agreement dated March 7, 2014, as amended by (i) that certain First Amendment to Lease Agreement dated June 25, 2014 ("First Amendment"); (ii) that certain Second Amendment to Lease dated August 26, 2020; and (iii) that certain Third Amendment to Lease dated June 30, 2022 ("Third Amendment"; and collectively, the "Lease"), pursuant to which Landlord leases to Assignor approximately 4,083 rentable square feet (accounting for the additional 215 rentable square feet leased by Tenant pursuant to the First Amendment) generally located at 121 South King Street, Seattle, King County, Washington 98104 (the "Premises"), on real property that is legally described in the Lease. The Premises are more particularly described in the Lease.

B.      Assignor desires to assign and transfer its interest in the Lease to Assignee and Assignee desires to assume Assignor's interest in the Lease; and

C.      Landlord desires to acknowledge and consent to Assignor's assignment and Assignee's assumption of the Lease.

### AGREEMENT

NOW, THEREFORE, for and in consideration of the foregoing, the terms and provisions of this Assignment, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties do hereby mutually covenant and agree as follows:

1.      Assignment of Lease.  As of the Effective Date, Assignor hereby assigns, transfers and conveys to Assignee all of Assignor's right, title, obligations, liabilities and interest as tenant in, to and under the Lease.

2.      Assumption of Lease.  As of the Effective Date, Assignee hereby assumes all of Assignor's right, title, obligations, liabilities and interest as tenant in, to and under the Lease, and agrees to perform and discharge all such obligations in accordance with their terms.

3.      Assignor to Remain Obligated.  Nothing in this Assignment shall be interpreted or construed as releasing the Assignor in any manner from full and complete responsibility and liability for all obligations and payments arising from or relating to the Lease, including without limitation all obligations arising under the promissory note executed by Assignor in connection with the Third Amendment (the "Note").  By executing this Assignment, the Landlord has consented solely to the assignment of the Lease to Assignee, but does not intend such consent to relieve or release the Assignor for any obligation or payment due under the Lease or the Note. Rather, Assignee shall execute and deliver to Landlord that certain First Amendment to Promissory Note in the form attached hereto as Exhibit A on

or about the Effective Date, and shall be joint and severally liable for all the obligations of "Tenant" or "Borrower" under the Lease and Note, respectively, from and after the Effective Date.

4.     No Modification of Lease.  Nothing in this Assignment shall be interpreted as a modification, alteration or amendment of the provisions of the Lease, except as expressly set forth herein.

5.     Indemnification.  Assignee shall defend, indemnify and hold Assignor harmless from and against any and all claims of any kind or nature related to or in connection with the Lease which result from events arising under the Lease from and after the Effective Date.  Assignor shall defend, indemnify and hold Assignee harmless from and against any and all claims of any kind or nature related to or in connection with the Lease which result from events arising under the Lease prior to the Effective Date.

6.     Landlord's Consent.  Landlord does hereby acknowledge, consent and agree to the terms of this Assignment.

7.     Notices.  Assignor's and Assignee's addresses for notices under the Lease shall be:

ASSIGNOR:

QUALITY ATHLETICS, LLC
Attn: Joshua Henderson
5617 236th Ave NE,
Redmond, WA 98053

With Copy To:

Cairncross & Hempelmann
Attn: David Herrman
524 Second Avenue, Suite 500
Seattle, WA 98104-2323

ASSIGNEE:

HWC BURBS BURGERS LLC
Attn: Joshua Henderson
5617 236th Ave NE,
Redmond, WA 98053

With Copy To:

Cairncross & Hempelmann
Attn: David Herrman
524 Second Avenue, Suite 500
Seattle, WA 98104-2323

8.     Security Deposit.  Landlord shall retain the security deposit paid by Assignor in accordance with the terms of the Lease.

9.     Agreement Binding Upon Successors.  This Assignment shall be binding upon and inure to the benefit of the Parties, and to their respective successors and assigns.

10. <u>Entire Agreement</u>. This Assignment and the Lease and the Note contain the entire agreement of the parties relative to the subject matter hereof. This Assignment may not be terminated or modified except as done in writing and signed by the Parties.

11. <u>Attorneys' Fees</u>: If any legal action or other proceeding is brought for the enforcement or because of an alleged dispute, breach or default in connection with any of the provisions of this Assignment or Lease or the Note, the prevailing Party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which such Party may be entitled.

12. <u>Applicable Law</u>. This Assignment shall be construed and interpreted under the laws of the state of Washington.

13. <u>Severability</u>. If any term or condition of this Assignment is held to be invalid or ineffective, then all other terms and conditions shall continue in full force and effect.

14. <u>Estoppel</u>. Assignor hereby certifies to Landlord that, to the best of its knowledge, as of the Effective Date, (i) the Lease is in full force and effect, (ii) Assignor's interest in the Lease has not been previously assigned and its interest in the Premises has not been subleased, (iii) the person executing this Assignment on behalf of Assignor has the full right and authority to execute this Assignment, (iv) Landlord is not in default under the Lease, (v) Assignor has no offsets, claims or defenses against Landlord with respect to any obligation or duty of Landlord arising pursuant to the Lease, and (vi) there are no existing circumstances which with the passage of time, or notice, or both, would give rise to a default by Landlord under the Lease. Assignor acknowledges and agrees that Landlord is relying on the estoppel provided herein as material consideration for approving the assignment of the Lease.

15. <u>Costs of Processing Assignment</u>. Pursuant to Section 18 of the Lease, Assignor shall pay the cost to process this Assignment, including attorneys' fees, in an amount not to exceed Five Hundred Dollars ($500.00).

16. <u>Counterparts</u>. This Assignment may be executed in counterparts, each of which shall constitute an original, but taken together shall constitute one and the same document, binding on all of the Parties hereto. This Assignment may also be executed and delivered by facsimile signature, PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000 (e.g., www.docusign.com). The individuals signing below on behalf of the Parties hereby represent and warrant that they are duly authorized to execute this Assignment on behalf of said Parties, and that such execution is binding upon said Parties without further action or ratification.

[Signatures on Next Page]

IN WITNESS WHEREOF, the Parties have hereto set their hands and have caused this Assignment and Assumption of Lease Agreement to be executed effective as of the Effective Date first written above.

"ASSIGNOR":    **QUALITY ATHLETICS, LLC,**
a Washington limited liability company

By:    Huxley Wallace Collective, LLC,
a Washington limited liability company
Its:    Manager

By:
Name: Joshua Henderson
Title:    Manager


"ASSIGNEE":    **HWC BURBS BURGERS LLC,**
a Washington limited liability company

By:
Name: Joshua Henderson
Title:    Manager


"LANDLORD":    **PIONEER SQUARE DEVELOPMENT LENDER, LLC,**
a Washington limited liability company

By:    R.D. Merrill Real Estate Holdings LLC,
a Washington limited liability company
Its:    Authorized Member

By:    R.D. Merrill Company,
a Washington corporation
Its:    Manager

By:
Name:    Douglas V. Spear
Its:    EVP - CFO

# EXHIBIT A

## Form of First Amendment to Promissory Note

FIRST AMENDMENT TO PROMISSORY NOTE

This First Amendment to Promissory Note (this "First Amendment") is dated effective as December 16, 2022 (the "Effective Date"), and is entered into by and among QUALITY ATHLETICS, LLC, a Washington limited liability company ("Quality Athletics"), HWC BURBS BURGERS LLC, a Washington limited liability company ("Burbs Burgers"), and PIONEER SQUARE DEVELOPMENT LENDER, LLC, a Washington limited liability company ("Lender").

RECITALS

A. Quality Athletics borrowed the sum of Two Hundred and Five Thousand Eight Hundred Ninety-Five Dollars ($205,895.00) from Lender, as evidenced by the Promissory Note dated October 5, 2022 (as amended, modified, supplemented, or replaced from time to time, collectively, the "Note"), which amount evidences Base Rent and Additional Rent (as such terms are defined in the Lease described hereafter) otherwise due by Quality Athletics to Lender through September 15, 2022 under that certain Lease Agreement dated March 7, 2014 (as amended, the "Lease").

B. Quality Athletics assigned its interest in the Lease to Burbs Burgers such that Quality Athletics and Burbs Burgers are now joint and severally liable for all the obligations of "Tenant" under the Lease.

C. Quality Athletics, Burbs Burgers, and Lender desire to amend the Note to reflect Burbs Burgers' assumption of the obligations thereof.

AMENDMENT

NOW, THEREFORE, in consideration of the mutual promises contained herein, the Parties agree to amend the Note as follows:

1. The parties hereby acknowledge the accuracy of the above Recitals and such Recitals are incorporated herein by this reference.

2. Terms not otherwise defined herein shall have the meanings accorded to such terms in the Note. In the event of a conflict between the terms defined herein and the terms defined in the Note, the terms defined herein shall control.

3. The Note is hereby amended to add Burbs Burgers as a "Borrower" (as defined in the Note) such that Burbs Burgers and Quality Athletics are now joint and severally liable for all the obligations of Borrower under the Note.

4. The Note remains in full force and effect in accordance with its respective terms, except as modified herein.

5. This First Amendment shall be governed by the law of the state of Washington.

6.     This First Amendment may be executed in multiple counterparts, each of which shall be an original part, but all of which shall constitute one instrument.

7.     Quality Athletics and Burbs Burgers authorize and direct Lender to append this First Amendment to the Note, and to mark the phrase "see first amendment to this note" to the face of the original Note.

8.     ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.

DATED effective as of the Effective Date.

"QUALITY ATHLETICS":       **QUALITY ATHLETICS, LLC,**
a Washington limited liability company

By:     Huxley Wallace Collective, LLC,
a Washington limited liability company
Its:     Manager

By:     _____
Name:  Joshua Henderson
Title:   Manager

"BURBS BURGERS":       **HWC BURBS BURGERS LLC,**
a Washington limited liability company

By:     _____
Name:  Joshua Henderson
Title:   Manager

"LENDER":       **PIONEER SQUARE DEVELOPMENT LENDER, LLC,**
a Washington limited liability company

By:     R.D. Merrill Real Estate Holdings LLC,
a Washington limited liability company
Its:     Authorized Member

By:     R.D. Merrill Company,
a Washington corporation
Its:     Manager

By:     _____
Name:  _____
Its:     _____

ASSIGNMENT AND ASSUMPTION OF LEASE - 6
16533387_2

# FIRST AMENDMENT TO PROMISSORY NOTE

This First Amendment to Promissory Note (this "First Amendment") is dated effective as December 16, 2022 (the "Effective Date"), and is entered into by and among QUALITY ATHLETICS, LLC, a Washington limited liability company ("Quality Athletics"), HWC BURBS BURGERS LLC, a Washington limited liability company ("Burbs Burgers"), and PIONEER SQUARE DEVELOPMENT LENDER, LLC, a Washington limited liability company ("Lender").

## RECITALS

A.     Quality Athletics borrowed the sum of Two Hundred and Five Thousand Eight Hundred Ninety-Five Dollars ($205,895.00) from Lender, as evidenced by the Promissory Note dated October 5, 2022 (as amended, modified, supplemented, or replaced from time to time, collectively, the "Note"), which amount evidences Base Rent and Additional Rent (as such terms are defined in the Lease described hereafter) otherwise due by Quality Athletics to Lender through September 15, 2022 under that certain Lease Agreement dated March 7, 2014 (as amended, the "Lease").

B.     Quality Athletics assigned its interest in the Lease to Burbs Burgers such that Quality Athletics and Burbs Burgers are now joint and severally liable for all the obligations of "Tenant" under the Lease.

C.     Quality Athletics, Burbs Burgers, and Lender desire to amend the Note to reflect Burbs Burgers' assumption of the obligations thereof.

## AMENDMENT

NOW, THEREFORE, in consideration of the mutual promises contained herein, the Parties agree to amend the Note as follows:

1.     The parties hereby acknowledge the accuracy of the above Recitals and such Recitals are incorporated herein by this reference.

2.     Terms not otherwise defined herein shall have the meanings accorded to such terms in the Note. In the event of a conflict between the terms defined herein and the terms defined in the Note, the terms defined herein shall control.

3.     The Note is hereby amended to add Burbs Burgers as a "Borrower" (as defined in the Note) such that Burbs Burgers and Quality Athletics are now joint and severally liable for all the obligations of Borrower under the Note.

4.     The Note remains in full force and effect in accordance with its respective terms, except as modified herein.

5.     This First Amendment shall be governed by the law of the state of Washington.

6.     This First Amendment may be executed in multiple counterparts, each of which shall be an original part, but all of which shall constitute one instrument.

7.    Quality Athletics and Burbs Burgers authorize and direct Lender to append this First Amendment to the Note, and to mark the phrase "see first amendment to this note" to the face of the original Note.

8.    ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.

DATED effective as of the Effective Date.

"QUALITY ATHLETICS":        **QUALITY ATHLETICS, LLC,**
a Washington limited liability company

By:    Huxley Wallace Collective, LLC,
a Washington limited liability company
Its:    Manager

By:
Name:  Joshua Henderson
Title:    Manager

"BURBS BURGERS":        **HWC BURBS BURGERS LLC,**
a Washington limited liability company

By:
Name:  Joshua Henderson
Title:    Manager

"LENDER":        **PIONEER SQUARE DEVELOPMENT LENDER, LLC,**
a Washington limited liability company

By:    R.D. Merrill Real Estate Holdings LLC,
a Washington limited liability company
Its:    Authorized Member

By:    R.D. Merrill Company,
a Washington corporation
Its:    Manager

By:    _____
Name:  _____
Its:    _____

# Exhibit B

# Tenant Unpaid Charges

**Property=000305**

**Date Range between 01/01/21 and 02/08/24**

| Property Code | Control Number | Unit Code | Tenant Status | Date Occurred | Period | Charge Type | Account Number | Current Owed | Amount Paid | Remark |
|---|---|---|---|---|---|---|---|---|---|---|
| **000305** | | | | | | | | | | |
| **t0002188** | **Quality Athletics, LLC** | | | | | | | | | |
| | C-3333870 | WEST-1 | Current | 12/01/2021 | 12/2021 | RNC | 41511012 | $7,088.88 | $2,911.12 | Rent - Commercial (12/2021) |
| | C-3358054 | WEST-1 | Current | 12/10/2021 | 12/2021 | USC | 58481103 | $458.20 | $0.00 | Wastewater |
| | C-3358055 | WEST-1 | Current | 12/10/2021 | 12/2021 | UBA | 58481104 | $4.00 | $0.00 | UtilityBilling-Admin Fee |
| | C-3358056 | WEST-1 | Current | 12/10/2021 | 12/2021 | UTG | 58481105 | $1,215.06 | $0.00 | Gas |
| | C-3358057 | WEST-1 | Current | 12/10/2021 | 12/2021 | UWC | 58481102 | $148.43 | $0.00 | Water |
| | C-3358058 | WEST-1 | Current | 12/10/2021 | 12/2021 | UBT | 58481101 | $1,930.74 | $0.00 | Trash |
| | C-3379595 | WEST-1 | Current | 01/01/2022 | 01/2022 | RNC | 41511012 | $10,000.00 | $0.00 | Rent - Commercial (01/2022) |
| | C-3402044 | WEST-1 | Current | 01/10/2022 | 01/2022 | UBA | 58481104 | $4.00 | $0.00 | UtilityBilling-Admin Fee |
| | C-3402045 | WEST-1 | Current | 01/10/2022 | 01/2022 | UTG | 58481105 | $1,535.53 | $0.00 | Gas |
| | C-3402046 | WEST-1 | Current | 01/10/2022 | 01/2022 | UWC | 58481102 | $135.00 | $0.00 | Water |
| | C-3402047 | WEST-1 | Current | 01/10/2022 | 01/2022 | USC | 58481103 | $416.75 | $0.00 | Wastewater |
| | C-3402048 | WEST-1 | Current | 01/10/2022 | 01/2022 | UBT | 58481101 | $1,947.50 | $0.00 | Trash |
| | C-3415916 | WEST-1 | Current | 01/24/2022 | 01/2022 | NSF | 42050000 | $40.00 | $0.00 | Returned check charge |
| | C-3417359 | WEST-1 | Current | 02/01/2022 | 02/2022 | RNC | 41511012 | $10,000.00 | $0.00 | Rent - Commercial (02/2022) |
| | C-3445328 | WEST-1 | Current | 02/10/2022 | 02/2022 | UBT | 58481101 | $1,881.08 | $0.00 | Trash |
| | C-3445329 | WEST-1 | Current | 02/10/2022 | 02/2022 | UBA | 58481104 | $4.00 | $0.00 | UtilityBilling-Admin Fee |
| | C-3445330 | WEST-1 | Current | 02/10/2022 | 02/2022 | UTG | 58481105 | $1,076.63 | $0.00 | Gas |
| | C-3445331 | WEST-1 | Current | 02/10/2022 | 02/2022 | UWC | 58481102 | $102.15 | $0.00 | Water |
| | C-3445332 | WEST-1 | Current | 02/10/2022 | 02/2022 | USC | 58481103 | $315.35 | $0.00 | Wastewater |
| | C-3468231 | WEST-1 | Current | 03/01/2022 | 03/2022 | RNC | 41511012 | $10,000.00 | $0.00 | Rent - Commercial (03/2022) |
| | C-3491493 | WEST-1 | Current | 03/10/2022 | 03/2022 | UBT | 58481101 | $1,881.62 | $0.00 | Trash |
| | C-3491494 | WEST-1 | Current | 03/10/2022 | 03/2022 | UBA | 58481104 | $4.00 | $0.00 | UtilityBilling-Admin Fee |
| | C-3491495 | WEST-1 | Current | 03/10/2022 | 03/2022 | UTG | 58481105 | $1,116.69 | $0.00 | Gas |
| | C-3491496 | WEST-1 | Current | 03/10/2022 | 03/2022 | UWC | 58481102 | $88.36 | $0.00 | Water |

| Property Code | Control Number | Unit Code | Tenant Status | Date Occurred | Period | Charge Type | Account Number | Current Owed | Amount Paid | Remark |
|---|---|---|---|---|---|---|---|---|---|---|
| 000305 | | | | | | | | | | |
| t0002188 | **Quality Athletics, LLC** | | | | | | | | | |
| | C-3491497 | WEST-1 | Current | 03/10/2022 | 03/2022 | USC | 58481103 | $272.78 | $0.00 | Wastewater |
| | C-3514810 | WEST-1 | Current | 04/01/2022 | 04/2022 | RNC | 41511012 | $10,000.00 | $0.00 | Rent - Commercial (04/2022) |
| | C-3540721 | WEST-1 | Current | 04/10/2022 | 04/2022 | UBT | 58481101 | $2,431.34 | $0.00 | Trash |
| | C-3540722 | WEST-1 | Current | 04/10/2022 | 04/2022 | UBA | 58481104 | $4.00 | $0.00 | UtilityBilling-Admin Fee |
| | C-3540723 | WEST-1 | Current | 04/10/2022 | 04/2022 | UTG | 58481105 | $1,268.73 | $0.00 | Gas |
| | C-3540724 | WEST-1 | Current | 04/10/2022 | 04/2022 | UWC | 58481102 | $100.51 | $0.00 | Water |
| | C-3540725 | WEST-1 | Current | 04/10/2022 | 04/2022 | USC | 58481103 | $309.73 | $0.00 | Wastewater |
| | C-3566683 | WEST-1 | Current | 05/01/2022 | 05/2022 | RNC | 41511012 | $10,000.00 | $0.00 | Rent - Commercial (05/2022) |
| | C-3591830 | WEST-1 | Current | 05/10/2022 | 05/2022 | UBT | 58481101 | $2,257.58 | $0.00 | Trash |
| | C-3591831 | WEST-1 | Current | 05/10/2022 | 05/2022 | UWC | 58481102 | $128.06 | $0.00 | Water |
| | C-3591832 | WEST-1 | Current | 05/10/2022 | 05/2022 | USC | 58481103 | $394.63 | $0.00 | Wastewater |
| | C-3591833 | WEST-1 | Current | 05/10/2022 | 05/2022 | UBA | 58481104 | $4.00 | $0.00 | UtilityBilling-Admin Fee |
| | C-3591834 | WEST-1 | Current | 05/10/2022 | 05/2022 | UTG | 58481105 | $1,408.61 | $0.00 | Gas |
| | C-3613973 | WEST-1 | Current | 06/01/2022 | 06/2022 | RNC | 41511012 | $10,000.00 | $0.00 | Rent - Commercial (06/2022) |
| | C-3641007 | WEST-1 | Current | 06/10/2022 | 06/2022 | UBT | 58481101 | $2,045.16 | $0.00 | Trash |
| | C-3641008 | WEST-1 | Current | 06/10/2022 | 06/2022 | UBA | 58481104 | $4.00 | $0.00 | UtilityBilling-Admin Fee |
| | C-3641009 | WEST-1 | Current | 06/10/2022 | 06/2022 | UTG | 58481105 | $1,304.58 | $0.00 | Gas |
| | C-3641010 | WEST-1 | Current | 06/10/2022 | 06/2022 | UWC | 58481102 | $143.21 | $0.00 | Water |
| | C-3641011 | WEST-1 | Current | 06/10/2022 | 06/2022 | USC | 58481103 | $441.32 | $0.00 | Wastewater |
| | C-3666730 | WEST-1 | Current | 07/01/2022 | 07/2022 | RNC | 41511012 | $10,000.00 | $0.00 | Rent - Commercial (07/2022) |
| | C-3689847 | WEST-1 | Current | 07/10/2022 | 07/2022 | UBT | 58481101 | $2,142.55 | $0.00 | Trash |
| | C-3689848 | WEST-1 | Current | 07/10/2022 | 07/2022 | UBA | 58481104 | $4.00 | $0.00 | UtilityBilling-Admin Fee |
| | C-3689849 | WEST-1 | Current | 07/10/2022 | 07/2022 | UTG | 58481105 | $1,255.70 | $0.00 | Gas |
| | C-3689850 | WEST-1 | Current | 07/10/2022 | 07/2022 | UWC | 58481102 | $193.74 | $0.00 | Water |
| | C-3689851 | WEST-1 | Current | 07/10/2022 | 07/2022 | USC | 58481103 | $490.29 | $0.00 | Wastewater |
| | C-3701583 | WEST-1 | Current | 08/01/2022 | 08/2022 | RNC | 41511012 | $10,000.00 | $0.00 | Rent - Commercial (08/2022) |

| Property Code | Control Number | Unit Code | Tenant Status | Date Occurred | Period | Charge Type | Account Number | Current Owed | Amount Paid | Remark |
|---|---|---|---|---|---|---|---|---|---|---|
| **000305** | | | | | | | | | | |
| **t0002188** | **Quality Athletics, LLC** | | | | | | | | | |
| | C-3701584 | WEST-1 | Current | 08/01/2022 | 08/2022 | UPK | 42060001 | $750.00 | $0.00 | Parking Rental - Unreserved (08/2022) |
| | C-3736983 | WEST-1 | Current | 08/10/2022 | 08/2022 | UBA | 58481104 | $4.00 | $0.00 | UtilityBilling-Admin Fee |
| | C-3736984 | WEST-1 | Current | 08/10/2022 | 08/2022 | UTG | 58481105 | $1,068.69 | $0.00 | Gas |
| | C-3736985 | WEST-1 | Current | 08/10/2022 | 08/2022 | UWC | 58481102 | $213.58 | $0.00 | Water |
| | C-3736986 | WEST-1 | Current | 08/10/2022 | 08/2022 | USC | 58481103 | $518.26 | $0.00 | Wastewater |
| | C-3736987 | WEST-1 | Current | 08/10/2022 | 08/2022 | UBT | 58481101 | $1,956.48 | $0.00 | Trash |
| | C-3761868 | WEST-1 | Current | 09/01/2022 | 09/2022 | RNC | 41511012 | $12,647.09 | $0.00 | Rent - Commercial (09/2022) |
| | C-3761869 | WEST-1 | Current | 09/01/2022 | 09/2022 | UPK | 42060001 | $750.00 | $0.00 | Parking Rental - Unreserved (09/2022) |
| | C-3787199 | WEST-1 | Current | 09/10/2022 | 09/2022 | UBA | 58481104 | $4.00 | $0.00 | UtilityBilling-Admin Fee |
| | C-3787200 | WEST-1 | Current | 09/10/2022 | 09/2022 | UTG | 58481105 | $464.41 | $0.00 | Gas |
| | C-3787201 | WEST-1 | Current | 09/10/2022 | 09/2022 | UWC | 58481102 | $248.97 | $0.00 | Water |
| | C-3787202 | WEST-1 | Current | 09/10/2022 | 09/2022 | USC | 58481103 | $604.14 | $0.00 | Wastewater |
| | C-3787203 | WEST-1 | Current | 09/10/2022 | 09/2022 | UBT | 58481101 | $2,166.58 | $0.00 | Trash |
| | C-3811737 | WEST-1 | Current | 10/01/2022 | 10/2022 | RNC | 41511012 | $5,000.00 | $0.00 | Rent - Commercial (10/2022) |
| | C-3834373 | WEST-1 | Current | 10/10/2022 | 10/2022 | UBA | 58481104 | $4.00 | $0.00 | UtilityBilling-Admin Fee |
| | C-3834374 | WEST-1 | Current | 10/10/2022 | 10/2022 | UBT | 58481101 | $2,095.12 | $0.00 | Trash |
| | C-3856496 | WEST-1 | Current | 11/01/2022 | 11/2022 | RNC | 41511012 | $5,000.00 | $0.00 | Rent - Commercial (11/2022) |
| | C-3882979 | WEST-1 | Current | 11/10/2022 | 11/2022 | UBA | 58481104 | $4.00 | $0.00 | UtilityBilling-Admin Fee |
| | C-3882980 | WEST-1 | Current | 11/10/2022 | 11/2022 | UBT | 58481101 | $1,801.24 | $0.00 | Trash |
| | C-3928134 | WEST-1 | Current | 12/01/2022 | 12/2022 | RNC | 41511012 | $5,000.00 | $0.00 | Rent - Commercial (12/2022) |
| | C-3933217 | WEST-1 | Current | 12/10/2022 | 12/2022 | UBA | 58481104 | $4.00 | $0.00 | UtilityBilling-Admin Fee |
| | C-3933218 | WEST-1 | Current | 12/10/2022 | 12/2022 | UTG | 58481105 | $1,541.21 | $0.00 | Gas |
| | C-3933219 | WEST-1 | Current | 12/10/2022 | 12/2022 | UWC | 58481102 | $143.49 | $0.00 | Water |
| | C-3933220 | WEST-1 | Current | 12/10/2022 | 12/2022 | USC | 58481103 | $442.18 | $0.00 | Wastewater |
| | C-3933221 | WEST-1 | Current | 12/10/2022 | 12/2022 | UBT | 58481101 | $1,824.62 | $0.00 | Trash |
| | C-3977386 | WEST-1 | Current | 01/01/2023 | 01/2023 | RNC | 41511012 | $5,000.00 | $0.00 | Rent - Commercial (01/2023) |

| Property Code | Control Number | Unit Code | Tenant Status | Date Occurred | Period | Charge Type | Account Number | Current Owed | Amount Paid | Remark |
|---|---|---|---|---|---|---|---|---|---|---|
| **000305** | | | | | | | | | | |
| **t0002188** | **Quality Athletics, LLC** | | | | | | | | | |
| | C-3980667 | WEST-1 | Current | 01/10/2023 | 01/2023 | UBA | 58481104 | $4.00 | $0.00 | UtilityBilling-Admin Fee |
| | C-3980668 | WEST-1 | Current | 01/10/2023 | 01/2023 | UTG | 58481105 | $1,858.22 | $0.00 | Gas |
| | C-3980669 | WEST-1 | Current | 01/10/2023 | 01/2023 | UWC | 58481102 | $120.58 | $0.00 | Water |
| | C-3980670 | WEST-1 | Current | 01/10/2023 | 01/2023 | USC | 58481103 | $371.58 | $0.00 | Wastewater |
| | C-3980671 | WEST-1 | Current | 01/10/2023 | 01/2023 | UBT | 58481101 | $2,218.82 | $0.00 | Trash |
| | C-4002045 | WEST-1 | Current | 01/26/2023 | 01/2023 | PCR | 41600000 | $17,374.26 | $0.00 | Q4 2022 Percentage Rent: 8% of Sales over $200,000 |
| | C-4003770 | WEST-1 | Current | 02/01/2023 | 02/2023 | RNC | 41511012 | $5,000.00 | $0.00 | Rent - Commercial (02/2023) |
| | C-4026009 | WEST-1 | Current | 03/01/2023 | 02/2023 | UBA | 58481104 | $4.00 | $0.00 | UtilityBilling-Admin Fee |
| | C-4026010 | WEST-1 | Current | 03/01/2023 | 02/2023 | UTG | 58481105 | $1,906.78 | $0.00 | Gas |
| | C-4026011 | WEST-1 | Current | 03/01/2023 | 02/2023 | USC | 58481103 | $437.98 | $0.00 | Wastewater |
| | C-4026012 | WEST-1 | Current | 03/01/2023 | 02/2023 | UBT | 58481101 | $2,208.43 | $0.00 | Trash |
| | C-4026013 | WEST-1 | Current | 03/01/2023 | 02/2023 | UWC | 58481102 | $142.13 | $0.00 | Water |
| | C-4052844 | WEST-1 | Current | 03/01/2023 | 03/2023 | RNC | 41511012 | $5,000.00 | $0.00 | Rent - Commercial (03/2023) |
| | C-4098787 | WEST-1 | Current | 04/01/2023 | 04/2023 | RNC | 41511012 | $5,000.00 | $0.00 | Rent - Commercial (04/2023) |
| | C-4143055 | WEST-1 | Current | 05/01/2023 | 05/2023 | RNC | 41511012 | $5,000.00 | $0.00 | Rent - Commercial (05/2023) |
| | C-4181345 | WEST-1 | Current | 05/01/2023 | 05/2023 | UBA | 58481104 | $4.00 | $0.00 | Utility Billing Admin Fee for 1/10/2023 - 2/9/2023 |
| | C-4181346 | WEST-1 | Current | 05/01/2023 | 05/2023 | UWC | 58481102 | $121.97 | $0.00 | Water for 1/10/2023 - 2/9/2023 |
| | C-4181347 | WEST-1 | Current | 05/01/2023 | 05/2023 | USC | 58481103 | $370.04 | $0.00 | Sewer for 1/10/2023 - 2/9/2023 |
| | C-4181348 | WEST-1 | Current | 05/01/2023 | 05/2023 | UTG | 58481105 | $1,721.03 | $0.00 | Domestic Hot Water for 1/10/2023 - 2/9/2023 |
| | C-4181349 | WEST-1 | Current | 05/01/2023 | 05/2023 | UBT | 58481101 | $2,007.70 | $0.00 | Trash for 1/10/2023 - 2/9/2023 |
| | C-4187240 | WEST-1 | Current | 05/30/2023 | 05/2023 | PCR | 41600000 | $11,162.13 | $0.00 | Q1 2023 Percentage Rent: 8% of Sales over $200,000 |
| | C-4187840 | WEST-1 | Current | 06/01/2023 | 06/2023 | RNC | 41511012 | $5,000.00 | $0.00 | Rent - Commercial (06/2023) |
| | C-4210741 | WEST-1 | Current | 06/01/2023 | 06/2023 | UBA | 58481104 | $4.00 | $0.00 | Utility Billing Admin Fee for 2/9/2023 - 3/11/2023 |
| | C-4210742 | WEST-1 | Current | 06/01/2023 | 06/2023 | UWC | 58481102 | $153.68 | $0.00 | Water for 2/9/2023 - 3/11/2023 |
| | C-4210743 | WEST-1 | Current | 06/01/2023 | 06/2023 | USC | 58481103 | $463.66 | $0.00 | Sewer for 2/9/2023 - 3/11/2023 |
| | C-4210744 | WEST-1 | Current | 06/01/2023 | 06/2023 | UTG | 58481105 | $1,884.77 | $0.00 | Domestic Hot Water for 2/9/2023 - 3/11/2023 |

| Property Code | Control Number | Unit Code | Tenant Status | Date Occurred | Period | Charge Type | Account Number | Current Owed | Amount Paid | Remark |
|---|---|---|---|---|---|---|---|---|---|---|
| 000305 | | | | | | | | | | |
| t0002188 | **Quality Athletics, LLC** | | | | | | | | | |
| | C-4210745 | WEST-1 | Current | 06/01/2023 | 06/2023 | UBT | 58481101 | $2,007.70 | $0.00 | Trash for 2/9/2023 - 3/11/2023 |
| | C-4235215 | WEST-1 | Current | 07/01/2023 | 07/2023 | RNC | 41511012 | $6,500.00 | $0.00 | Rent - Commercial (07/2023) |
| | C-4249544 | WEST-1 | Current | 07/01/2023 | 07/2023 | UBA | 58481104 | $4.00 | $0.00 | Utility Billing Admin Fee for 3/11/2023 - 4/25/2023 |
| | C-4249545 | WEST-1 | Current | 07/01/2023 | 07/2023 | UWC | 58481102 | $230.02 | $0.00 | Water for 3/11/2023 - 4/25/2023 |
| | C-4249546 | WEST-1 | Current | 07/01/2023 | 07/2023 | USC | 58481103 | $694.64 | $0.00 | Sewer for 3/11/2023 - 4/25/2023 |
| | C-4249547 | WEST-1 | Current | 07/01/2023 | 07/2023 | UTG | 58481105 | $2,830.49 | $0.00 | Domestic Hot Water for 3/11/2023 - 4/25/2023 |
| | C-4249548 | WEST-1 | Current | 07/01/2023 | 07/2023 | UBT | 58481101 | $3,011.55 | $0.00 | Trash for 3/11/2023 - 4/25/2023 |
| | C-4283849 | WEST-1 | Current | 08/01/2023 | 08/2023 | RNC | 41511012 | $8,500.00 | $0.00 | Rent - Commercial (08/2023) |
| | C-4286504 | WEST-1 | Current | 08/01/2023 | 08/2023 | UBA | 58481104 | $4.00 | $0.00 | Utility Billing Admin Fee for 4/25/2023 - 6/9/2023 |
| | C-4286505 | WEST-1 | Current | 08/01/2023 | 08/2023 | UWC | 58481102 | $323.54 | $0.00 | Water for 4/25/2023 - 6/9/2023 |
| | C-4286506 | WEST-1 | Current | 08/01/2023 | 08/2023 | USC | 58481103 | $832.98 | $0.00 | Sewer for 4/25/2023 - 6/9/2023 |
| | C-4286507 | WEST-1 | Current | 08/01/2023 | 08/2023 | UTG | 58481105 | $1,283.47 | $0.00 | Domestic Hot Water for 4/25/2023 - 6/9/2023 |
| | C-4286508 | WEST-1 | Current | 08/01/2023 | 08/2023 | UBT | 58481101 | $1,406.36 | $1,567.81 | Trash for 4/25/2023 - 6/9/2023 |
| | C-4434266 | WEST-1 | Current | 11/01/2023 | 11/2023 | RNC | 41511012 | $5,000.00 | $0.00 | Rent - Commercial (11/2023) |
| | C-4435530 | WEST-1 | Current | 11/01/2023 | 11/2023 | UBT | 58481101 | $63.78 | $1,918.99 | Trash for 8/9/2023 - 9/10/2023 |
| | C-4590556 | WEST-1 | Current | 01/29/2024 | 01/2024 | PCR | 41600000 | $18,713.17 | $0.00 | Q4 2023 Percentage Rent: 8% of Sales over $200,000 |
| | C-4591263 | WEST-1 | Current | 02/01/2024 | 02/2024 | RNC | 41511012 | $5,000.00 | $0.00 | Rent - Commercial (02/2024) |
| | C-4593687 | WEST-1 | Current | 02/01/2024 | 02/2024 | UBT | 58481101 | $2,693.73 | $0.00 | Trash |
| | C-4593688 | WEST-1 | Current | 02/01/2024 | 02/2024 | UBA | 58481104 | $4.00 | $0.00 | UtilityBilling-Admin Fee |
| | C-4593689 | WEST-1 | Current | 02/01/2024 | 02/2024 | UTG | 58481105 | $1,824.62 | $0.00 | Gas |
| | C-4593690 | WEST-1 | Current | 02/01/2024 | 02/2024 | UWC | 58481102 | $134.95 | $0.00 | Water |
| | C-4593691 | WEST-1 | Current | 02/01/2024 | 02/2024 | USC | 58481103 | $415.85 | $0.00 | Wastewater |

**Total For Quality Athletics, LLC**     **$298,273.16**     **$6,397.92**

| Property Code | Charge Type | SubTotal |
|---|---|---|
| **000305** | | |
| | NSF - NSF Fee | 40.00 |
| | PCR - Percentage Rent | 47,249.56 |
| | RNC - Commercial Rent | 169,735.97 |
| | UBA - Utility Bill Admin Fee | 80.00 |

| | |
|---|---:|
| UBT - Utility Bill Trash | 41,979.68 |
| UPK - Unreserved Parking | 1,500.00 |
| USC - Utility Bill Sewer | 8,250.36 |
| UTG - Utility Bill Gas | 26,565.22 |
| UWC - Utility Bill Water | 2,872.37 |
| **000305** | **298,273.16** |
| **Grand Total** | **298,273.16** |